UNITED STATES of America, Plaintiff,

v.

PARK SIDE COURT, INC., Defendant.

UNITED STATES of America, Plaintiff,

v.

SEAWYN COURT, INC., Defendant.

Civ. Nos. 425–64, 462–64.

United States District Court
D. New Jersey.

Aug. 9, 1966.

David M. Satz, Jr., U. S. Atty., Newark, N. J., by Donald G. Targan, Asst. U. S. Atty., Camden, N. J., for plaintiff.

W. Louis Bossle, Camden, N. J., for petitioners, Roy E. Anderson and Joy Bright Ofstie.

### FINDINGS OF FACT
### and
### CONCLUSIONS OF LAW

COHEN, District Judge.

This proceeding arises out of two mortgage foreclosure actions instituted in this Court by Plaintiff, United States of America, for the use, benefit and credit of Philip N. Brownstein, Federal Housing Commissioner, under provisions of the National Housing Act, as amended, 28 U.S.C. § 1345. The mortgages which were foreclosed were each on different multi-family housing units of the separate New Jersey corporate defendants, situate in Wildwood, New Jersey. Between the judgment of foreclosure, December 4, 1964, and the advertised forced sale, April 20, 1965, the petitioners, Roy E. Anderson and Joy Bright Ofstie, sought proprietary control of these corporations and attempted to interest the Federal Housing Administration in a proposition, whereby they would salvage these corporate mortgages through refinancing of these projects. In order to accomplish this, they proposed a stay of the sale and a six month

moratorium on the mortgage payments in consideration of a pledge of $10,000.00 ($5,000.00 from each of defendant corporations) as evidence of good faith, during which period they would seek a refinancing source, to redeem the properties from foreclosure judgments, or failing that to reinstate the mortgages and thereafter recast them for the balance of their installment terms. Various conversations, conferences and correspondence ensued in an effort to consummate this venture. During these negotiations a Receiver was appointed to manage the housing units and to collect the rents. The negotiations failed of ultimate resolution, and the properties were readvertised for sale during December, 1965, the sale date being fixed for January 11, 1966. Four days before the scheduled sale, Mr. Anderson and Mrs. Ofstie filed petitions for an order to show cause why the mortgages should not be reinstated. Sale was stayed pending a hearing on the petitions. Plaintiff moved to dissolve the restraints and asserted sovereign immunity from suit.

On June 9, 1966, testimony was taken without a jury; thereafter, briefs and proposed findings were submitted by counsel. The bar of immunity was briefed but not argued orally, the United States Attorney not having pressed for argument. Nevertheless, it will be disposed of at the outset. Authority to strike this defense is clear. The Federal Housing Administration is the real party in interest. Congress, having launched its agency into the world of commerce, endowed it with both the right to sue and be sued as any other private enterprise. Darlington, Inc. v. Federal Housing Administration, 142 F.Supp. 341, (D.C.S.C.1956) redetermined by Statutory Court on remand, 154 F.Supp. 411 (D.C.S.C.1957), reversed on other grounds 358 U.S. 84, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958), rehearing denied 358 U.S. 937, 79 S.Ct. 310, 3 L.Ed.2d 311 (1959).

Analysis of the evidence in this case leads to the conviction in that, despite extensive negotiations between the parties, no meeting of the minds in fact ever actually occurred, and consequently no contract for reinstatement came into being. There is no evidence of mutual understanding and agreement on essential terms; nor was there in fact any tender of performance by petitioners, even under their alleged understanding of the arrangements between the parties. This being so, the payment of $10,000.00 made by petitioners as good faith, in anticipation of the execution of a contract for reinstatement of the defaulted mortgages, and to which it was to be thereafter applied, is refundable to them, as no contract to which the payment was to be a part was ever consummated.

In support of this conclusion and pursuant to Rule 52, Fed.R.Civ.P., 28 U.S.C., the following findings and conclusions are made:

### FINDINGS OF FACT

1. Judgments of foreclosure were entered on November 20, and December 4, 1964, against Seawyn Court, Inc., and Park Side Court, Inc., respectively.

2. Foreclosure sale of these properties was duly advertised and scheduled for April 20, 1965.

3. The parties hereto entered into negotiations, whereby the scheduled sale was cancelled and an option granted to petitioners until October 20, 1965, during which term the parties proposed to finalize the essential conditions of a contract for redemption of the foreclosure judgment or, in the alternative, for a reinstatement of the mortgages.

4. To this end, a meeting was arranged and held in the latter part of March, 1965, at the principal office of the Federal Housing Administration in Washington, D. C. This meeting was attended by petitioner Anderson, Ward H. Bright, a realtor and brother of Mrs. Ofstie, the other petitioner, and acting on her behalf, and Mr. Marsh Cunningham, the National Director of the Rental Housing Division, who was assigned by the Commissioner of the Federal Housing Administration to represent the interests of that agency. In addition, sev-

eral other persons from the Department of Justice and the housing agency were present.

5. At this meeting, Mr. Anderson, an architect by profession, explained that he had made studies, plans and estimates for the complete rehabilitation of the two apartment projects at an estimated cost of $300,000.00; that he believed he could obtain permanent financing to cover such cost, as well as provide funds sufficient to redeem the mortgages held by the federal agency; and he speculated, that with the proposed repairs and improvements to the properties, he and Mrs. Ofstie would be able to increase the rentals, thus making both projects self-supporting. It was proposed by petitioners that they would deposit $10,-000.00 with the federal agency as a pledge of good faith; that the foreclosure sale scheduled for April 20, 1965 be cancelled; that a six month moratorium be declared by the federal agency, during which period petitioners were to pay the mortgages in full with costs, or reinstate them by the payment of all interest due to October 1, 1965, including the regular October principal payment, and then the other costs and defaulted amounts were to be recast as augmented installment payments over the unexpired terms of the respective mortgages, along with the balance of principal due. Additionally, petitioners represented that they could and would acquire the capital stock of both corporate mortgagors, and pledge it with the federal agency as collateral security during the terms of the mortgages. The meeting concluded without firm commitment. It was agreed, however, that petitioners would submit written detailed proposals, as discussed, to the office of the Federal Housing Administration in Camden, New Jersey.

6. Subsequent phases of the negotiations were conducted by David Perskie, Esquire, as attorney for petitioners.

7. On April 5, 1965, Mr. Perskie wrote to Commissioner Brownstein, outlining the position of petitioners and their offer to contract on certain terms.[1] This letter in part reads as follows:

"There is available to deposit promptly upon your notifying us of your acceptance of this proposition the sum of $10,000.00, which my clients will be willing to forfeit if at the end of six months they are unable to bring all past-due interest on each property to date, after which it is contemplated that they will continue to make the regular payments required under your mortgages, augmented by a proportionate part of the principal which should have been paid by the end of the six-month period, but which will not have been paid at that time.

"It is our understanding that the properties are now producing sufficient in the hands of the Receiver to meet the mortgage requirements as to interest. Consequently, we submit for your consideration the fact that the Government stands to lose nothing by accepting this proposition. If the mortgage is not reinstated at the end of six months, the sale can then be had, but, in the meantime, the Government will have $10,000.00 on hand, which my people are, as indicated, now willing to put up. This $10,000 may be retained by the Government at the end of the six-month period as further security for the ability of my people to reinstate the mortgages in full and there would be no objection, for a period of five years, for the Government to maintain its present mortgage position, so that in the event of default foreclosure proceedings would not have to be recommenced.

\* \* \* \* \*

"Time is very much of the essence and it would be appreciated if you would let us have a prompt response."

---

1. The correspondence between the parties will be amply set forth in order to demonstrate the complete lack of understanding of each other and, precisely, what would be the essential terms for a reinstatement contract.

Following this letter, Mr. Perskie spoke with Mr. Cunningham of the federal agency, which conversation he confirmed by letter dated April 7, 1965, directed to the Camden office of the agency in anticipation of a prearranged meeting there on April 9, 1965.

8. The April 7, 1965, letter covered the same subject-matter as that of April 5th, in substantially the same language.

9. On April 9, 1965, Mr. Perskie wrote to Mr. Cunningham submitting his version of the proposal made on behalf of the petitioners and attempting to clarify his understanding of the offer to the federal agency. The body of the letter is as follows:

"Pursuant to our telephone conversation and in clarification of all previous correspondence in this matter, please be advised that our clients, Roy E. Anderson and Joy Bright Ofstie who are about to consummate a purchase of all of the stock of·Park Side Court, Inc., and Seawyn Court, Inc. and who have had no previous proprietary interest in either of these corporations, herewith tender $10,000.00 to the Federal Housing Administration which sum is to be forfeited if on or before six months from the date previously scheduled for the foreclosure sale of property owned by said corporations one or the other of the following contingencies does not occur:

"1. The foreclosure judgment and costs shall have been paid in full.

"2. The existing mortgages shall have been reinstated to the satisfaction of the F. H. A.[2] so that the said mortgages shall be liquidated in full over the original terms thereof, the monthly payments to be increased, if necessary, in order to effectuate the full payment over the original term, and it being further understood that commitments must be given to bring the property to a satisfactory state of repair.

"In consideration of the foregoing my clients request a stay of the sale under foreclosure for the six-month period aforesaid.

"The aforementioned $10,000.00 will be delivered to you forthwith upon your request for same."

9. Mr. Cunningham acknowledged receipt of the foregoing letter by his letter dated April 13, 1965, saying he was referring the April 9th letter of clarification to General Counsel with a request for him to obtain compliance with the terms and arrange for a stay; he also stated that in addition to a tender of $10,000.00, petitioners should be prepared to place all their corporate stock in escrow.

10. The month of May was uneventful, except that by letter dated May 28, 1965, Lester H. Thompson forwarded to Mr. Perskie, at Mr. Cunningham's re-

2. Both the correspondence exchanged between the parties, as well as the testimony of Mr. Perskie and Mr. Cunningham, demonstrated that at no time did they in fact clearly understand and mutually agree as to just what form such compliance would have to take in order to meet with requirements satisfactory to the federal agency.

182

quest, a "Statement of Amounts Required to Reinstate the Mortgages as of May 1, and as of June 1, 1965". These statements are as follows:

"Statement of Amounts Required to Reinstate Mortgage as at May 1, and as at June 1, 1965

Park Side Court, Inc.
Project No. 035–42060 CHM
Wildwood, New Jersey

| | Total Amounts Due 5–1–65 | Monthly Payment Due 6–1–65 | Total Amounts Due 6–1–65 |
|---|---|---|---|
| Service Charges | $ 113.88 | $ 56.94 | $ 170.82 |
| Deposits for Taxes | 517.96 | 430.04 | 948.00 |
| Mortgage Interest | 8,154.22 | 478.68 | 8,632.90 |
| Principal Payments | 7,526.30 | 389.63 | 7,915.93 |
| Reserve for Replacements | 1,435.00 | 75.75 | 1,510.75 |
| Reserve for Replacements Delinquency | 427.85 | 21.38 | 449.23 |
| Total Amounts Due | $18,175.21 | $1,452.42 | $19,627.63 |

Reflected in the above figures are Receiver's funds of $5732.21 received by this office on 3/10/65.

Not reflected in the above figures is $5,000.00 received on 5/7/65 from David M. Perskie in accordance with an agreement contained in a letter dated 4/9/65 from Perskie & Perskie to FHA.

The above figures are subject to adjustment by any additional funds received from Ralph J. Kmiec, Receiver for this project. Prepared by: Comptroller's Division, Federal Housing Administration, May 28, 1965."

"Seawyn Court, Inc.
Project No. 035–42012 CHM
Wildwood Crest, New Jersey

Statement of Amounts Required to Reinstate Mortgage as at May 1, and as at June 1, 1965

| | Total Amounts Due 5–1–65 | Total Payment Due 6–1–65 | Total Amounts Due 6–1–65 |
|---|---|---|---|
| Interest on Advances for Taxes and Insurance | $ 27.21 | $ 19.99 | $ 47.20 |
| Service Charges | 140.08 | 70.04 | 210.12 |
| Advances for Taxes and Insurance | 5,885.26 | —— | 5,885.26 |
| Mortgage Interest | 9,982.57 | 587.21 | 10,569.78 |
| Principal Payments | 8,862.01 | 537.07 | 9,399.08 |
| Reserve for Replacements | 1,235.39 | 72.67 | 1,308.06 |
| Reserve for Replacements Delinquency | 300.40 | 17.67 | 318.07 |
| Total Amounts Due | $27,341.80 | $1,738.91 | $29,080.71 |

Reflected in the above figures are Receiver's funds of $1,805.83 received by this office on March 8, 1965.

Not reflected in the above figures is $5,000.00 received 5/7/65 from David M. Perskie in accordance with an agreement contained in a letter dated 4/9/65 from Perskie & Perskie to FHA.

The above figures are subject to adjustment by any additional funds received from Ralph J. Kmiec, Receiver for this project. Prepared by: Comptroller's Division, Federal Housing Administration, May 28, 1965."

---

11. On June 9, 1965, Mr. Perskie acknowledged receipt of the reinstatement analyses, and inquired about the Receiver's receipts. He was given this information on June 15th.

12. On June 23, 1965, Mr. Perskie acknowledged receipt of the information regarding rents of the Receiver and their application to the projects, but confessed to confusion, stating:

"I am now somewhat confused about a very important phase of this entire transaction. You will recall that for the deposit of $10,000.00 my clients are given the privilege of reinstating these mortgages at the end of a given period of time, or of paying them off. So that there will be no possible confusion, would you be good enough to advise me, excluding the advances that my people have already put up, how much will be necessary to reinstate the mortgages on each of the properties as of this time. In this way, my clients will be in a position to know exactly how much money must be raised."

13. Replying to this inquiry a statement issued from Mr. Thompson under date of July 1, 1965:

"In response to your letter of June 23, 1965, the amounts required to reinstate the above mortgages as at July 1, 1965 are furnished below. The amounts shown are exclusive of the $10,000.00 deposit advanced by your clients but do reflect the application of receivership funds received to date.

| | Seawyn Court, Inc. | Park Side Court, Inc. |
|---|---|---|
| Interest on Advances (thru 7/1/65) | $ 14.38 | $ –0– |
| Service Charges | 70.04 | 56.94 |
| Advances for Taxes & Insurance | 5,620.93 | –0– |
| Deposits for Taxes | 513.23 | 516.94 |
| Mortgage Interest | 11,156.99 | 6,461.64 |
| Principal Installments | 9,937.94 | 8,306.85 |
| Reserve for Replacements | 1,380.73 | 1,586.50 |
| Reserve for Replacements Delinquency | 335.74 | 470.61 |
| Amounts required to reinstate loans at 7/1/65 | $29,029.98 | $17,399.48" |

14. Again confusion abounded in the camp of the petitioners. For by letter dated July 13, 1965, we find the following stated by their counsel:

"My clients and I are both somewhat confused by the figures contained in your letter of July 1, 1965.

"Under the arrangements made whereby the foreclosure sale was stayed, which arrangements were contained in my letter to the Federal Housing Administration in Camden under date of April 7th, as confirmed by my letter to Mr. Cunningham under date of April 9th, my clients at the end of the six-month period are to bring all past-due interest on each property to date and are to make the regular payments required under the mortgage, augmented by that portion of the principal which should have been paid by the end of the six-month period, but which will not have been paid by that time. Thus, the item of Principal Installments contained in your letter of July 1st, as to each property, is not necessary to bring the mortgages to date, since this item is to be paid for over the *original period of mortgage* by augmenting the monthly payments in the proper proportion to enable this to occur.

"I think the best way to handle this situation is for you to be good enough to allow my client, Mr. Anderson, to visit with you and to go over the figures, so that everyone will be clear on the subject. Mr. Anderson can appear in *Washington any Tuesday, Thursday or Friday* afternoon suitable to your convenience and it would be very much appreciated if you would let me know a date in the near future when such a conference can be had, so that we may all be certain of what we will need to present to you at the expiration of the six-month period."

15. The reaction of the federal agency was embodied in a letter dated July 27, 1965, from Mr. Cunningham, as follows:

"Mr. Lester H. Thompson, Assistant Commissioner-Comptroller, has asked that we be responsive to your letter of July 13, 1965, wherein you express confusion over the figures contained in Mr. Thompson's letter of July 1, 1965.

"At this juncture the mortgages have not been modified; therefore, Mr. Thompson was quite correct in including the delinquent principal installments in the breakdown of amounts due to reinstate the mortgages. If you and your client are interested in the amount due, exclusive of principal, it certainly would be a simple matter to deduct those amounts from the computation furnished you. We are at a complete loss to understand why it would be necessary to have a conference for the purpose of making that computation.

"One very important factor to be considered at the end of the sixth month period is the commitment which must be given to bring the properties to a satisfactory state of repair and maintenance. Accordingly, if your client plans reinstatement, it is not too early for him to be conferring with our local office as to the requirements in this area."

16. Correspondence persisted. On August 10, 1965, Mr. Perskie requested a projection of monthly payment figures, assuming petitioners were to reinstate the mortgages, as he did not have information to "compute the increased amount it will take to pay off the added principal occasioned by the original default".

17. Mr. Cunningham responded on August 16, 1965 as follows:

"In your letter of August 10, 1965 you asked for monthly payment figures based on the assumption that arrangements are made to set aside the existing judgments and reinstate the mortgages under modification agreements recasting principal over the remaining mortgage terms.

"If your assumption should in fact become a reality then the following would represent the payment figures applicable for the October 1, 1965, and subsequent monthly payments:

| | Seawyn | Park Side | Total |
|---|---|---|---|
| Service Charge* | $ 71.81 | $ 58.68 | $ 130.49 |
| Tax Accruals** | 422.50 | 395.27 | 817.77 |
| Principal & Interest | 1,167.80 | 900.22 | 2,068.02 |
| Replacement Reserve | 72.67 | 75.75 | 148.42 |
| TOTAL | $1,734.78 | $1,429.92 | $3,164.70 |

* Subject to slight reduction yearly.
** Subject to change as taxes may increase or decrease.

---

"Based on tentative figures as we know them today and still using your assumption, reinstatement of the mortgages during the month of October, 1965, would involve the following payments:

| | Seawyn | Park Side | Total |
|---|---|---|---|
| Interest on Advances | $ 71.06 | $ —— | $ 71.06 |
| Service Charge | 281.93 | 229.50 | 511.43 |
| Taxes | 7,401.66 | 1,702.75 | 9,104.41 |
| Interest | 12,918.62 | 7,897.68 | 20,816.30 |
| Principal | 580.59 | 421.54 | 1,002.13 |
| Reserve for Replacements | 2,605.94 | 3,176.80 | 5,782.74 |
| TOTAL | $23,859.80 | $13,428.27 | $37,288.07 |

---

"The above figures are (1) exclusive of the $10,000 deposit, (2) inclusive of the October installments given in the first breakdown, (3) after application of funds received from the receiver to date only, and (4) exclusive of amounts required to place the properties in acceptable physical condition."

18. On August 16, 1965, Mr. Perskie requested a complete accounting of arrearages at the time of default, a receiver's account, and repair requirements; this request crossed Mr. Cunningham's above letter in the mails of the same date. Nevertheless, on August 19th, Mr. Cunningham advised that inspections for repairs were in process, the requirements for which would be forthcoming. That information was supplied on August 27, 1965, in detail and the amounts necessary were $11,600.00 for Seawyn Court, Inc., and $9,400.00 for Park Side Court, Inc.

19. Finally, the flood of correspondence ebbed to an exchange of letters dated September 14 and September 20, 1965, from Mr. Perskie and Mr. Cunningham, respectively. Mr. Perskie stated that his clients were interested in reinstating the mortgages pursuant to correspondence dated April 7 and 9, 1965; that they would be obliged to pay interest and taxes to date on both projects. Mr. Cunningham replied that if reinstatement were attempted, it must include repairs as indicated on August 27th, and that cash escrows to assure completion would be required.

20. After the foreclosure was stayed, the $10,000.00 deposit was made and the corporate stock of the defendant corpora-

tions pledged by the petitioners with the federal agency.

21. Mr. Anderson, one of the petitioners, testified that his efforts to obtain financing to enable reinstatement or redemption of the mortgages failed.[3] But he indicated, through Mr. Perskie, that he would probably seek to reinstate the mortgages at the end of the six-month period.

22. No discussion ensued between Mr. Cunningham and Mr. Perskie regarding "accruals", "service charges" and "reserves for replacements", as testified to this effect by both gentlemen. However, these items were set forth in the written statements referred to above stating the items and amounts of money necessary to effect reinstatement. Under Mr. Perskie's version of the rather elastic arrangements of this transaction, petitioners were to pay only delinquent interest and taxes, and lump all other charges into an augmented monthly installment plan under a recast mortgage payable within the remainder of the original term. Mr. Cunningham, however, testified that the figures supplied to Mr. Perskie were to effect reinstatement, and not such as were to be held in abeyance during reinstatement and picked up thereafter, to be included in the recast mortgage arrangement as contended by petitioners. To accept the petitioners' version of the arrangement to effect reinstatement of the mortgages would obligate them only to pay interest of $7,675.56, plus taxes on Park Side Court, Inc., and interest of $9,395.63, plus taxes on Seawyn Court, Inc. If this were accomplished then the $10,000.00 deposit would remain as security against default within the next ensuing five year period; if no default, then it would be credited in reduction of the outstanding mortgage balances.

23. The petitioners, after making deposit of $10,000.00 and pledging the corporate stock, made no tender of payment for reinstatement during the six-month moratorium period. Thereafter, the federal agency considered petitioners in default, and readvertised the properties for sale.

24. Analysis of this case leads to a conclusion, that in fact there was no meeting of the minds regarding ultimate terms and conditions establishing a reinstatement contract. Whether the federal agency required as a counter-proposal the payment of at least delinquent principal prior to the moratorium period, together with interest and taxes, as well as other current charges, or whether mere payment of interest and taxes would be sufficient, all other charges being matter for subsequent recasting, is not clearly manifested by the parties. Redemption, of course, meant to them an entirely new undertaking, i. e., liquidation of all outstanding charges and cancellation of the foreclosure judgment. Therefore, aside from an arrangement to stay execution, the negotiations never crystallized in fact into a contract. Consequently, the $10,000.00 pledge for performance as an incident to reinstatement, failing of legal consideration, is refundable to petitioners.

CONCLUSIONS OF LAW

1. This Court has jurisdiction of this matter. 28 U.S.C. § 1345.

■■■ 2. The plaintiff, United States of America, is acting on behalf and for the benefit of the Federal Housing Administration, and is not immune from suit. Darlington, Inc. v. Federal Housing Administration, supra.

■■■ 3. The present proceeding on the petitioners' order to show cause, is more in the nature of a declaratory judgment. They are entitled to have their rights determined in this action. Maryland Casualty Co. v. Consumers Finance Service, 101 F.2d 514 (3 Cir. 1938), Rule 57, F.R.Civ.P., 28 U.S.C.

4. Plaintiff and petitioners entered into a binding agreement to extend the foreclosure sale from April 20, 1965 to October 20, 1965, during which period they contemplated making a contract

---

3. Understandably, the presence of involuntary receivership did not attract refinancing, nor was it conducive to new investment capital.

providing for performance by the petitioners in alternate manners. They could pay the foreclosure judgment in full, thus succeeding to all the right, title and interest of the plaintiff, or they could refinance, reinstate and recast the two mortgages on terms agreeable to them, as well as to the Federal Housing Administration, during the six-month moratorium period. Petitioners did not redeem; and they failed to reinstate during the option period, because no mutual understanding on the essential terms of the proposed contract, i. e., specific charges to be paid to reinstate and to bring the mortgages current, ever crystallized between the parties. The federal agency was not seeking a partner to share defaults under the existing foreclosed mortgages. It did consider, however, a proposal which would remedy these defaults and render the mortgage investments current and sound again. To Mr. Cunningham of the federal agency, and his accounting staff, this meant payment of defaulted principal and other charges as set forth in the statements of what was required to effect reinstatement; while to petitioners, it may have meant the payment of delinquent interest at most, all other charges to be loaded into a recast mortgage after reinstatement. It is inconceivable that the federal agency contemplated or manifested intent to release these foreclosed multi-apartment projects upon the payment of interest and taxes, and by mere substitution of new credit without payment of the substantial defaults.[4]

5. While the correspondence between the parties was extensive, and petitioners sought to rely on their proposal letters of April, 1965, as establishing their contractual rights, they ignore the agency's understanding of these negotiations and stated demands regarding the performance it expected from petitioners. These negotiations were both oral and written. However, neither the oral nor the written exchanges, or a combination of them, ever ripened into a mutual understanding as to the establishment of ultimate terms of a contract between them for the reinstatement of the mortgages. Nor did a contract arise by integration in writing. United States v. Clementon Sewerage Authority et al., 365 F.2d 609 (3 Cir. 1966). As stated in Atlantic Northern Airlines v. Schwimmer, 12 N.J. 293, at page 304, 96 A.2d 652, at page 657 (1958) which adopts the treatise of Wigmore regarding parole evidence in contract law:

> "Whether a particular subject of negotiation is embodied by the writing depends wholly upon the intent of the parties; but the intent must be judged by an external standard. The writing is not 'wholly and intrinsically self-determinative of the parties' intent to make it the sole memorial' of the subject of negotiation; this intent 'must be sought where always intent must be sought, namely, in the conduct and language of the parties and the surrounding circumstances. The document alone will not suffice.'"

In examining the element of mutual assent, a lucid statement is contained in Leitner v. Braen, 51 N.J.Super. 31, at page 38, 143 A.2d 256, at page 260 (App. Div.1958):

> "The concept of mutual assent is customarily stated as one of the primary requisites to the formation of an informal contract. Such mutual assent is, however, unimportant except as it is manifested by one party to the other, generally by a communicated offer and acceptance. (Citations omitted) So the obligation depends not on the so-called real intent of a party, but on that expressed. (Citations omitted) The phrase, 'meeting of the minds,' can properly mean only the agreement reached by the parties as expressed, i. e., their manifested intention, not one secret or undisclosed, which may be wholly at variance with

---

4. It should be noted that the default on the Seawyn Court, Inc. mortgage has existed since October 1, 1963; default on the Park Side Court, Inc., mortgage since January 1, 1964.

188

the former. (Citations omitted) It is in this sense only that the formation of a contract can be said to require the 'meeting of the minds' of the parties." The record in this case does not point to the manifest establishment of a mutual understanding and agreement on essential terms for the proposed reinstatement. Six months spanned the negotiations between men expert in these matters, yet confusion and misunderstanding defeated the crystalization of a contract in the present regard. Unlike the facts in *Leitner,* supra, the situation here is within the limited exception to the objective manifestation rule, which applies where the manifestation of intention of either party is uncertain or ambiguous, as set forth in Section 71 of the Restatement of Contracts, and see Williston on Contracts, (rev. ed. 1936), § 95. The manifestations of the intentions of the parties here were too incomplete and vague to give rise to an enforceable contract. And as was succinctly stated in Friedman v. Tappan Development Corp., 22 N.J. 523, at page 531, 126 A.2d 646, at page 650 (1956):

> "In a word, a contract is a voluntary obligation proceeding from a common intention arising from an offer and acceptance. (Citation omitted) To be enforceable, a contract must be sufficiently definite in its terms that the performance to be rendered by each party can be ascertained with reasonable certainty." (Citation omitted)

No such reasonable certainty exists in the instant case.

■ 6. The good faith pledge of $10,000.00, contemplated the making of a contract for reinstatement of the mortgages. No such contract having come into being, the pledge should be refunded to petitioners.

7. The order to show cause shall be dismissed and the restraint of execution on the foreclosure judgment shall be dissolved.

Counsel for plaintiff shall submit an appropriate order in accordance herewith, and without costs to either party.