V. B. HAMILTON, appellant, v. LYLE WOSEPKA et al., appellees.

No. 52430.

(Reported in 154 N.W.2d 164)

300

November 14, 1967.

Linnan, Lynch & Straub, of Algona, for appellant.

Hobson, Cady & Drew, of Hampton, for appellees.

MASON, J.—This law action tried to the court arose out of the purchase of plaintiff Hamilton's stock in two related companies, Farmers Hybrid Seed Corn Company and Farmers Hybrid Hogs, both of Hampton by defendants Wosepka, Pronk and Chandler. Both companies had the same stock ownership, directors and officers. On a former appeal we held plaintiff's claim was not barred by the statute of limitations. Hamilton v. Wosepka, 255 Iowa 910, 124 N.W.2d 512.

Plaintiff Hamilton now seeks to recover from the three defendants personally additional salary allegedly due under a written contract dated May 20, 1959. He appeals from dismissal of his petition.

Plaintiff had been in the employ of the original company since August 1, 1944, and president, director and stockholder in both companies since April 1954 at an annual salary of $15,000. He had acquired 780 shares of stock in each company. As of May 20, 1959, Wosepka was in the employ of the companies as secretary and assistant in sales at a salary of $7000; Pronk was vice-president and sales manager at a salary of $10,000; and Chandler was assistant treasurer and manager of sales department at a salary of $10,000.

At this time there were 4177 shares of stock outstanding in each company. 2455 of these were owned by Mr. and Mrs. Methfessel.

Defendants were seeking to gain control of the companies and were negotiating with the Methfessels for the purchase of their stock. They apparently were desirous of obtaining an option to purchase plaintiff's stock until they could make certain they would be able to acquire the Methfessel stock and thus the control of both companies.

On April 20, 1959, plaintiff gave defendants a 30-day written option to purchase 730 of his shares in each company for $65,000 on certain stated terms and conditions. Defendants gave written notice of their intention to exercise the option and on May 20 entered into the written contract for the purchase of plaintiff's stock.

By June 19 defendants had acquired control of both companies and on that date by action of the board of directors of the two companies Wosepka's salary was increased from $7000 to $15,000 per year, the salaries of Pronk and Chandler were each increased from $10,000 to $15,000 effective July 1. These salaries remained at $15,000 until November 1, 1962. Plaintiff's salary was not increased by the companies and he remained in the employ of the companies as president at the same salary of $15,000 until September 1, 1962. At that time defendants paid the balance due on the purchase price of plaintiff's stock,

the stock was transferred and the sale completed. Plaintiff was compensated at the annual rate of $15,000 until November 1, 1962, when his services were terminated. Defendants had exercised their option to purchase plaintiff's remaining 50 shares in each company under the terms of the contract which expressly provided that if plaintiff's employment be terminated defendants were to have the right to purchase his stock at book value.

Plaintiff then brought this action to recover from defendants personally the sum of $33,333.33, the amount of additional salary he asserts defendants had agreed to pay him under the terms of the contract. The only matter in dispute is whether plaintiff is entitled to the amount demanded in his petition as additional compensation.

In deciding the question it must be determined what the parties meant by what they said in this basic provision contained in paragraph 4 of the agreement:

"The Party of the First Part shall remain a member of the Board of Directors and President of the above named companies at a guaranteed salary of $15,000.00 per year, *said salary to be increased or decreased in proportion to the increase or decrease of the salary or salaries* of Lyle Wosepka, Nick Pronk and Wilbur Chandler, and said employment shall continue at least as long as any of the indebtedness for the purchase price of said stock exists." (Emphasis supplied.)

Defendants admitted the execution of the contract, but contended it was ambiguous, entered into by mutual mistake and asserted there was an oral understanding the salaries of the three defendants were to be all fixed at $15,000, the same as plaintiff's and that the provision of the written contract as to increase of salary was to become effective only after their salaries had been equalized with plaintiff's and asked for reformation, but did not ask that the action be transferred to equity for equitable relief. Defendants also pleaded waiver and estoppel.

Evidence was offered by defendants, all over plaintiff's objection that it was in violation of the parol-evidence rule,

of the negotiations leading up to the execution of the May 20 contract.

Plaintiff contends paragraph 4, set out supra, has but one unambiguous meaning. He argues the contract, after expressly providing that plaintiff shall remain in the employ of the companies at an annual salary of $15,000, plainly states "said salary to be increased or decreased in proportion to the increase or decrease of the salary or salaries of Lyle Wosepka, Nick Pronk and Wilbur Chandler"; since their salaries were all raised to $15,000, plaintiff was entitled to a proportionate increase at the same time and a personal judgment against defendants for the amount thereof.

The trial court was not convinced the paragraph has but one meaning, first because it purports to give plaintiff a "guaranteed salary of $15,000 per year;" then in the same sentence provision is made that such salary may be "increased or decreased." In addition the contract says, "in proportion to the increase or decrease of the salary or salaries" of defendants, and the word "proportion" has many definitions.

The court concluded that under these circumstances the actual intent of the parties must be determined from the situation of the parties and the objects they were trying to accomplish, that oral evidence was admissible and to be regarded as relevant in interpreting the writing. Further, the practical construction placed on the contract by the conduct of the parties was entitled to great weight. As stated, plaintiff's petition was dismissed. No question of reformation or mistake is now involved.

Plaintiff's appeal assigns 11 errors relied upon for reversal. They all present his contention that the court erred in admitting extrinsic evidence for the purpose of aiding in the interpretation of the written contract.

■ I. This law action is not reviewable de novo here but only on errors assigned. The court's findings of fact have the effect of a jury verdict if there is substantial evidence to support them, rule 344(f)(1), Rules of Civil Procedure, unless in arriving at them the court erred in its rulings on evidence or in other respects upon questions of law. Ferris v. Employers

Mutual Cas. Co., 255 Iowa 511, 514, 515, 122 N.W.2d 263, 265. We may also find error if the trial court applied erroneous rules of law which materially affected the decision. France v. Benter, 256 Iowa 534, 536, 128 N.W.2d 268, 270.

We will not weigh the evidence or the credibility of the witnesses. Rule 344(f)(1), R.C.P. Further, the evidence will be construed in the light most favorable to the trial court's judgment. McCune v. Muenich, 255 Iowa 755, 757, 124 N.W.2d 130, 131.

II. Before the execution of the April 20 option plaintiff and defendants had four meetings at which they discussed the purchase of plaintiff's stock. The first of these meetings took place on the preceding Friday in a cafe and was then transferred to the office of defendants' attorney. A later meeting was held at Chandler's home Friday evening. The fourth, at which attorneys for both parties were present, took place Saturday evening. The option was prepared the following Monday.

Each defendant was permitted to testify in regard to conversations, negotiations and transactions leading up to the purchase of plaintiff's stock over timely objection by plaintiff that it was in violation of the parol-evidence rule.

In substance defendants testified that at the first meeting on Friday they told plaintiff they would like to purchase 730 shares of his stock and were willing to pay a fair price for it; they wanted plaintiff to remain with the companies as president. They contend plaintiff was told, if the transaction went through, defendants would have to have their salaries raised to the point where his was in order to meet the obligations that they were picking up by reason of their purchasing his and Methfessels' stock; the matter of when the scale would be effective was discussed due to the fact at that point defendants were not in the position to effect this change immediately and would not be until they came into control of the company; that it was stated the salaries of plaintiff and defendants would all be the same; that plaintiff raised the question about subsequent increases or decreases in salary and was told that raises or decreases would be the same for everyone. All of this

was assuming that all transactions were completed so that the stock transfers were made as defendants hoped.

Plaintiff testified:

"It is my testimony that preceding the signing of the written option, the matter of my salary and payment and raises were discussed, but not the salaries of the three defendants. In the negotiations for the sale of my stock, the security for the payment to me was discussed. The matter of their salaries and increases in salaries never came up only as they were written in the contract."

Plaintiff's attorney during these negotiations also testified as to his recollection of the conversations and transactions during the various meetings. As a result of his and plaintiff's testimony there was a sharp conflict in the evidence.

It was the function of the trial court to ascertain the true intent and meaning of the parties to the contract as revealed by the language used there; "* * * 'not by showing that the parties meant something other than what they said, but by showing what they meant by what they said.'" Central Heights Imp. Co. v. Memorial Parks, Inc., 40 Cal. App.2d 591, 608, 105 P.2d 596, 605, and citations. It is not what the parties meant to say but what they meant by what they did say. Bankers Trust Co. v. Allen, 257 Iowa 938, 944, 135 N.W. 2d 607, 610, 611.

After having considered the extrinsic evidence of the antecedent negotiations leading up to the execution of the option and contract the trial court found the parties meant by what they said in paragraph 4 of the contract that defendants' salaries would be raised because of the personal obligations being assumed by them if the entire transaction went through (the purchase of plaintiff's, the Methfessels' and Dean Anderson's stock); July 1 was fixed as the effective date of the salary adjustment if the Methfessel negotiations were successful; the salaries of all four would be $15,000 annually and if any of the salaries were changed, all would be changed; and that plaintiff after conferring with his counsel announced at the meeting held on Saturday evening agreement with the proposal for the terms of the option.

■ This is not a case where the oral testimony is received for the purpose of varying the terms of a written instrument. This is a case where such oral testimony was received for the purpose of interpreting it.

We believe the fact Pronk and Chandler were each receiving $10,000 and Wosepka $7000 annually on the execution of the option and contract makes the emphasized portion of paragraph 4, supra, susceptible to more than one meaning. Was the increase or decrease to be proportionately in amount or percentage? Was it to be based on an average of the increase or decrease of all three defendants?

Plaintiff seems to recognize the doubt as to what was meant and that there are different methods of interpreting the emphasized phrase for in his own testimony he explains how he arrived at the amount claimed in the petition. He says, "I do it by percentage. * * * I added them together and took the percentage of increase. * * * We could have taken the lower one or average; and we thought it was fair to add them together. I was going by the contract. In my interpretation it is percentage. You could take the lowest one or the highest one." He further testified that "if Wosepka's salary had been reduced to $1000 a year I don't know what would have happened to my salary." If such a thing had happened, under one clause of paragraph 4 plaintiff's salary would have been decreased in some percentage and by some portion in direct contradiction to his "guaranteed salary of $15,000." Can a guaranteed salary be decreased?

The court did not err in ruling on plaintiff's objections. This extrinsic evidence, confined as it was to the purpose of interpretation, was relevant and admissible.

■ III. Extrinsic evidence that throws light on the situation of the parties, the antecedent negotiations, the attendant circumstances and the objects they were thereby striving to attain is necessarily to be regarded as relevant to ascertain the actual significance and proper legal meaning of the agreement.

Professor Corbin in the preface to Volume 3 of his work on contracts says:

"The purpose of interpretation as justice requires is always

the discovery of actual intention:—the intentions of both parties if they are the same,—the actual intention of one party if the other knew or had reason to know what it was,—but absolutely never to give effect to a meaning of words that neither party in fact gave them, however many other people might have given them that meaning."

4 Williston on Contracts, Third Ed. (by Jaeger), section 602 states:

"The word 'interpretation' is used with respect to language itself; * * *

"* * *

"* * * [It] is properly the process of applying the ordinary legal standard to the words or symbols used in order to determine their meaning or sense and rules of interpretation are adopted for this purpose."

"By 'interpretation of language' we determine what ideas that language induces in other persons." 3 Corbin on Contracts, section 534, quoted in Morris Plan Leasing Co. v. Bingham Feed and Grain Co., 259 Iowa 404, 415, 143 N.W.2d 404, 412.

"A word is not a crystal, transparent and unchanged; it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." 4 Williston on Contracts, Third Ed., section 609, quoting Justice Holmes, in Towne v. Eisner, 245 U.S. 418, 425, 38 S. Ct. 158, 159, 62 L. Ed. 372, 376, L.R.A. 1918D 254, 258.

" 'To say dogmatically that we "know what a word means" *in advance of its utterance* is nonsense. All we can know in advance is *approximately* what it *will* mean. After the utterance, we interpret what has been said in the light of both verbal and physical contexts, and act according to our interpretation * * * ' (Emphasis not added). 4 Williston on Contracts, Third Ed., section 609, quoting from Liberty Mutual Insurance Company v. Hercules Powder Company, 3 Cir., 224 F.2d 293, 296." Rasch Construction Co. v. City of Bloomfield, 261 Iowa 544, 153 N.W.2d 718.

It is sometimes said that if the words of a contract are

plain and clear, evidence of surrounding circumstances to aid interpretation is not admissible. "It is true that when a judge reads the words of a contract he may jump to the instant and confident opinion that they have but one reasonable meaning and that he knows what it is. A greater familiarity with dictionaries and the usages of words, a better understanding of the uncertainties of language, and a comparative study of more cases in the field of interpretation, will make one beware of holding such an opinion so recklessly arrived at." 3 Corbin on Contracts, section 535.

"A word is but a symbol which may stand for one of an innumerable number of objects." 2 Sutherland Statutory Construction, Third Ed. (by Horack), section 4502.

"No parol evidence that is offered can be said to vary or contradict a writing until by process of interpretation it is determined what the writing means. The 'parol evidence rule' is not, and does not purport to be, a rule of interpretation or a rule as to the admission of evidence for the purpose of interpretation. Even if a written document has been assented to as the complete and accurate integration of the terms of a contract, it must still be interpreted; and all those factors that are of assistance in this process may be proved by oral testimony.

"It is true that the language of some agreements has been believed to be so plain and clear that the court needs no assistance in interpreting. Even in these cases, however, it will be found that the court has had the aid of parol evidence of the surrounding circumstances. The meaning to be discovered and applied is that which each party had reason to know would be given to the words by the other party. Antecedent and surrounding factors that throw light upon this question may be proved by any kind of relevant evidence.

"* * * Such testimony does not vary or contradict the written words; it determines that which cannot be varied or contradicted. * * *." 3 Corbin on Contracts, section 579.

In support of the text Corbin quotes extensively from Atlantic Northern Airlines v. Schwimmer, 12 N.J. 293, 96 A.2d 652, not only in section 579, supra, but in several other sections.

The case involved the interpretation of a general release pleaded as a separate defense in an action for conversion of an airplane and for value of its use. Because of the importance given this case by Professor Corbin, we feel justified in quoting extensively therefrom commencing at page 656 of 96 A.2d:

"Evidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement. This is so even when the contract on its face is free from ambiguity. The polestar of construction is the intention of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for the intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded. The admission of evidence of extrinsic facts is not for the purpose of changing the writing, but to secure light by which to measure its actual significance. Such evidence is adducible only for the purpose of interpreting the writing—not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning of what has been said. So far as the evidence tends to show, not the meaning of the writing, but an intention wholly unexpressed in the writing, it is irrelevant. The judicial interpretive function is to consider what was written in the context of the circumstances under which it was written, and accord to the language a rational meaning in keeping with the expressed general purpose. Casriel v. King, 2 N.J. 45, 65 A.2d 514, 517 (1949).

"The 'parol evidence rule' is a rule of substantive law not related to interpretation or the admission of evidence for the purpose of interpretation. Oral testimony of facts relevant to meaning are not within that principle. Parol evidence cannot be said 'to vary or contradict a writing until by process of interpretation it is determined what the writing means. * * * Such testimony does not vary or contradict the written words; it determines that which cannot be varied or contradicted.' Corbin on Contracts, section 579. The 'parol evidence rule' purports to exclude testimony 'only when it is offered for the purpose of "varying or contradicting" the terms of an "integrated" contract; it does not purport to exclude evidence of-

fered for the purpose of interpreting and giving a meaning to those terms. The terms of any contract must be given a meaning by interpretation before it can be determined whether an attempt is being made to "vary or contradict" them.' Ibid. sections 536, 543.

"* * * the antecedent negotiations and attendant circumstances may be shown by parol to make plain the meaning of the written words. Language is only too often an imperfect and uncertain means of communicating ideas and concepts. Professor Corbin says that rarely in a litigated case do the words of a contract convey 'one identical meaning to the two contracting parties or to third persons.' Corbin on Contracts, sections 536, 560. Litigation proceeding from the poverty of language is constant."

At page 657 of 96 A.2d, the court adopts the treatise of Wigmore regarding parol evidence in contract law:

"Whether a particular subject of negotiation is embodied by the writing depends wholly upon the intent of the parties; but the intent must be judged by an external standard. The writing is not 'wholly and intrinsically self-determinative of the parties' intent to make it the sole memorial' of the subject of negotiation; this intent 'must be sought where always intent must be sought, namely, in the conduct and language of the parties and the surrounding circumstances. The document alone will not suffice. What it was intended to cover cannot be known till we know what there was to cover. The question being whether certain subjects of negotiation were intended to be covered, we must compare the writing and the negotiations before we can determine whether they were in fact covered.' 9 Wigmore on Evidence, Third Ed., sections 2413, 2430, 2431." Cited with approval in United States v. Park Side Court, Inc., (N.J.) 257 F. Supp. 177, 187. For a detailed reference to this quotation from Wigmore as it is actually applied in the receipt of evidence see Barber v. Rochester, 52 Wash.2d 691, 328 P.2d 711, 714, 715.

In construing integrated contracts the New Jersey courts permit introduction of parol evidence as to the relation of the parties and the circumstances under which the contract was made, and the objects which the parties were thereby striving

to accomplish, not for the purpose of changing the writing, but to secure light by which to ascertain its actual significance. Gray v. Joseph J. Brunetti Construction Co., 3 Cir., 266 F.2d 809, 814, 815, citing authorities.

In a later New Jersey case, Garden State Plaza Corp. v. S. S. Kresge Co., 78 N.J. Super. 485, 496, 189 A.2d 448, 454, petition for certification denied, 40 N.J. 226, 191 A.2d 63, involving construction of a rider to a written lease the trial court rejected parol evidence offered by lessee. The court in reversing and remanding the cause for a new trial held the interpretation contended for by the lessee was one which the words of the lease would bear, that extrinsic evidence was therefore admissible and said:

"* * * the parol evidence rule applies only to prevent the substantive alteration of contractual terms agreed upon by parties and expressed in an integration of their bargain, by resort to other prior or contemporaneous agreements or understandings. But the parol evidence rule does not even come into play until it is first determined what the true agreement of the parties is—i.e., what they meant by what they wrote down. Only when that is determined is one in an appropriate position to raise the bar of the parol evidence rule to prevent alteration or impugnment of the agreement by the asserted contradictory prior or contemporaneous agreement. In other words, interpretation and construction must necessarily precede protection against forbidden contradiction or modification. And in the process of interpretation and construction of the integrated agreement all relevant evidence pointing to meaning is admissible because experience teaches that language is so poor an instrument for communication or expression of intent that ordinarily all surrounding circumstances and conditions must be examined before there is any trustworthy assurance of derivation of contractual intent, even by reasonable judges of ordinary intelligence, from any given set of words which the parties have committed to paper as their contract. Construing a contract of debatable meaning by resort to surrounding and antecedent circumstances and negotiations for light as to the meaning of the words used is never a violation of the

parol evidence rule. And debatability of meaning is not always discernible at the first reading of a contract by a new. mind. More often it becomes manifest upon exposure of the specific disputed interpretations in the light of the attendant circumstances.

"The foregoing is fundamental doctrine (citing extensive authorities)."

For a collection of authorities supporting the sections of Corbin cited herein, see United States v. Lennox Metal Manufacturing Co., 2 Cir., 225 F.2d 302, 314, 315. See also Asheville Mica Co. v. Commodity Credit Corporation, 2 Cir., 335 F.2d 768, 769; Olsson v. Nelson, 248 Ala. 441, 28 So.2d 186, 189, and citations; Coley v. W. P. Brown & Sons Lumber Co., 251 Ala. 235, 37 So.2d 125, 129, 130, and citations; Templeman v. Walker, 175 Okla. 366, 52 P.2d 737, 743, 744; Seavey Hop Corporation v. Pollock, 20 Wash.2d 337, 147 P.2d 310, 316; and Dawson v. Shearer, 53 Wash.2d 766, 337 P.2d 46, 47, and citations.

Professor Richard S. Hudson has collected, analyzed and criticized our own cases dealing with the problem since 1931 in articles appearing in 10 Drake Law Review 87 (1961) supplemented in 13 Drake Law Review 131, 151 (1964) and again in 15 Drake Law Review 61, 90 (1966). He suggests in his first article .at page 89 that a "reconciliation of Iowa cases during the period under surveillance is not deemed to be worthwhile, or even possible."

Inman Mfg. Co. v. American Cereal Company, 124 Iowa 737, 100 N.W. 860, cited by plaintiff, was before this court four times. The reasoning therein is severely criticized in 3 Corbin on Contracts, sections 534 and 535.

Proof of the circumstances may make a meaning plain and clear when in absence of such proof some other meaning may also have seemed plain and clear. Sometimes the circumstances proof of which is offered do not have any probative value and do not affect a meaning that is arrived at without them. When such is the case, such circumstances are immaterial. In other cases, the testimony of additional factors may not be believed by the trial court after it has been admitted,

in which case the meaning of words that are otherwise "plain and clear" will be adopted.

Of course, an otherwise "plain" meaning should not be disturbed by the proof of irrelevant circumstances or of those having only a remote bearing or inconsequential weight. But until a court knows the circumstances it cannot properly say that they have no probative value. Rasch v. City of Bloomfield, supra. Citing 3 Corbin on Contracts, section 542.

Some authorities hold such extrinsic evidence may be considered, only if the language of the contract is ambiguous and that courts will not disregard the plain language of a contract or interpolate something not contained in it; also the courts will not write contracts for the parties to them nor construe them other than with the plain and literal meaning of the language used.

"* * * The 'ambiguity-on-its-face' rule is a vestigial remain of a notion prevailing in 'primitive law.' 'The primitive law,' says Wigmore, 'looked only at the expression. * * * The mark of primitive legal standards, throughout all, is formalism.' [9 Wigmore on Evidence, Third Ed., pp. 10–37] * * *
"* * *

"Accordingly, it is regarded by many authorities as a fallacy that, in interpreting contractual language, a court may not consider the surrounding circumstances unless the language is patently ambiguous. Any such rule, like all rules of interpretation, must be taken as a guide, not a dictator. The text should always be read in its context." United States v. Lennox Metal Manufacturing Co., supra, 225 F.2d at 310, 311.

The existence of so many statements that parol evidence is not admissible to aid in the interpretation of an integration unless the words of the writing are ambiguous makes the significance of the word "ambiguity" itself important. In view of what we have said here it is proper to ask, "ambiguous to whom." As to "what is ambiguity" see 3 Corbin on Contracts, section 543A, pocket parts.

We believe there is substantial evidence to support the trial court's doubt that paragraph 4 has but one meaning.

IV. At the meeting of the board of directors of the two

corporations, presided over by plaintiff and attended by the three defendants, without a dissenting vote or protest on the part of anyone, the salary schedule was adopted effective July 1, 1959, raised the salary of Wosepka to $15,000, the salaries of Pronk and Chandler to $15,000 and fixing plaintiff's salary at $15,000, which was the amount he was receiving prior to 1959.

From July 1, 1959, until September 1962 regular board meetings were held, presided over by plaintiff. Defendants made semiannual payments of principal to plaintiff. In the normal office routine, one or more of defendants was in daily contact with plaintiff during the more than three years the agreement was in effect, yet plaintiff never made a demand for additional salary or any reference thereto until approximately September 1, 1962, when the final payment was made by defendants on the stock purchase.

The practical construction placed upon a contract of doubtful meaning by the parties themselves will usually be adopted by the courts. Gilbrech v. Kloberdanz, 252 Iowa 509, 513, 107 N.W.2d 574, 576, 577, and citations; Theobald v. Weber, 259 Iowa 452, 458, 143 N.W.2d 418, 422, 423, and citations.

The court found that the parties by their conduct from May 20, 1959, to September 1, 1962, placed a practical construction upon the contract; that the four of them were to draw the same salary; and that this coupled with the fact that such was their intention does not entitle plaintiff to recover.

There being substantial evidence to support the trial court's findings, no error in its rulings on evidence nor any application of erroneous rules of law, the matter is—Affirmed.

All JUSTICES concur except LARSON, J., who concurs in result.