420 F.2d 365
 Maryjo Feldmiller LANGER, Individually and as Independent Executrix of the Estate of Matthew Robert Gardner, II, Deceased, Appellant,
v.
IOWA BEEF PACKERS, INC., an Iowa Corporation, Appellee.
Maryjo Feldmiller LANGER, Individually and as Independent Executrix of the Estate of Matthew Robert Gardner, II, Deceased, Appellee,
v.
IOWA BEEF PACKERS, INC., an Iowa Corporation, Appellant.
 No. 19618.
 No. 19619.
 United States Court of Appeals Eighth Circuit.
 January 2, 1970.
 Rehearing Denied January 29, 1970.
 
 Malcolm D. Young, Omaha, Neb., for Langer, etc.; William E. Naviaux, Omaha, Neb., and Leland C. White, Harlan, Iowa, on the briefs.
 P. L. Nymann, Dakota City, Neb., for Iowa Beef Packers; George F. Davis, Sioux City, Iowa, on the briefs.
 Before MEHAFFY, GIBSON and HEANEY, Circuit Judges.
 HEANEY, Circuit Judge.
 
 
 1
 Two issues are raised on this appeal[1] from the United States District Court for the Northern District of Iowa: (1) Is a stock option agreement which provides that the option shall terminate if the optionee ceases to be an employer of the optionor "for any reason, whether voluntarily, [or] involuntarily" terminated by the optionor's sale of a part of the assets of its business including the optionee's employment contract? The District Court held in the affirmative as a matter of Law. We reverse. (2) Was there sufficient evidence of an arrangement to pay a bonus for the District Court to submit that question to the jury? We hold that the submission was proper.
 
 
 2
 I. STOCK OPTION.
 
 
 3
 On September 23, 1963, M. R. Gardner and Iowa Beef Packers, Inc. (IBP), entered into a Stock Option Agreement under which Gardner was given an option to purchase one hundred shares of the common stock of IBP for $1,615.[2] In consideration for this option, Gardner agreed to remain in continuous employment for IBP for two years before the option could be exercised. The option was, thereafter, to remain open and exercisable for a period of three years, from September 23, 1965, until September 23, 1968.
 
 
 4
 The Stock Option Agreement included the following section:
 
 
 5
 "5. In the event OPTIONEE ceases to be an employee of IBP or any subsidiary thereof for any reason, whether voluntarily, involuntarily, or by death, any option or unexpired portion thereof granted to him which is otherwise exercisable shall thereupon terminate."[3]
 
 
 6
 At the time the Stock Option Ageement was executed, Gardner was employed at the IBP plant in Denison, Iowa. In mid-1964, Gardner was transferred to the IBP plant in Perry, Iowa, as manager of that plant.
 
 
 7
 On October 22, 1965, less than a month after Gardner completed the two years of service, his consideration for the stock option, and before he had exercised his option, IBP sold the plant at Perry to Oscar Mayer & Company. Included in the sale were the assignment of the employment contracts of the personnel at the Perry plant and a covenant by IBP not to hire the Perry plant personnel for a period of eighteen months after the sale. Gardner's employment with IBP, therefore, was severed by the sale.
 
 
 8
 On Saturday, October 23, 1965, IBP attempted to reach Gardner by telephone to request that he travel to Denison to discuss the sale. Gardner, however, was out of town, and he did not learn of the sale until October 25, 1965. He was told on that date, by the Chairman of the Board of IBP, that since Gardner was no longer working for IBP, his stock option was "invalid."
 
 
 9
 On February 24, 1966, Gardner tendered payment of $1,615 to IBP to purchase the stock under the Stock Option Agreement. The tender was refused by IBP.
 
 
 10
 Initially, we note that the assignment of Gardner's employment contract was made in good faith and was not done for the purpose of affecting Gardner's option. The question presented is simply whether the District Court correctly applied Iowa law by holding that the option terminated upon IBP's sale of part of its assets including Gardner's employment contract.
 
 
 11
 We hold that the District Court correctly decided that this issue should be determined as a matter of law, but erred in its application of the law. Contract interpretation is generally a matter of law, while the intent of the parties is generally a question of fact.[4] But where no extrinsic evidence is necessary to determine the intent of the parties, and where the intent is implicit from the agreement and from its context, the legal effect of the agreement is properly resolved by the courts as a matter of law.[5]
 
 
 12
 IBP argues on appeal that the District Court correctly interpreted the Stock Option Agreement, that the language of Section 5 of the Agreement is clear, and that the plain meaning of that section requires a termination of Gardner's option because of the sale of the Perry plant. We cannot agree.
 
 
 13
 The primary purpose of a company stock option plan is the attraction and retention of desirable employees, and the granting of an option is considered a form of compensation.[6]
 
 
 14
 An option agreement is subject to the same rules of interpretation as an ordinary contract. Maytag Company v. Alward, 253 Iowa 455, 112 N.W. 2d 654, 96 A.L.R.2d 162 (1962). An option is a continuing offer which may not be withdrawn prior to its expiration date for the reason that the promise is based on a consideration. Sargent & Co. v. Heggen, 195 Iowa 361, 190 N.W. 506, 508 (1922). The consideration for an option is the employee's agreement to work for the company for a specified period of time. Maytag Company v. Alward, 112 N.W.2d at 661.
 
 
 15
 In cases with circumstances analogous to the facts here, courts have been reluctant to deny or permit the exercise of options where such would result from an unreasonable or unfair interpretation of the option contract. Maytag Company v. Alward, supra, is persuasive here. In that case, an employee entered into a stock option contract agreeing to remain with the company for three years. Before the three years expired, the employee exercised his option and voluntarily terminated his employment. The company argued that the stock option contract should be rescinded on the ground of failure of consideration. The employee argued that, by the plain meaning of the contract, he should be allowed to keep any options he exercised prior to the termination of his employment. The clause of the contract relied upon by the employee stated that any termination of employment, voluntarily or for cause, would terminate "any option or options held by him under the Plan, to the extent not theretofore exercised." Maytag Company v. Alward, 112 N.W.2d at 656. (Emphasis supplied.) The court, holding against the employee because of a failure of consideration, stated that the effect of the employee's argument,
 
 
 16
 "* * * would render the contract of little value to plaintiff. Defendant * * * could virtually terminate plaintiff's rights under it merely by exercising his option and then violating his agreement to serve. It is quite unlikely the parties intended to enter into such an unreasonable contract."
 
 
 17
 Maytag Company v. Alward, 112 N.W.2d at 658.
 
 
 18
 We feel the Iowa court would give weight to the case of Gaines v. Monroe Calculating Mach. Co., Inc., 78 N.J.Super. 168, 188 A.2d 179 (1963). There, the option agreement stated that if the optionee's employment were terminated "voluntarily or involuntarily within five (5) years from the date of employment," the company could declare the agreement void. One and a half years later, the company dismissed the optionee without cause and declared the option void. The trial court relied on the plain meaning of the contract and granted summary judgment to the company. The Superior Court of New Jersey reversed.
 
 
 19
 "The word `involuntarily' has no meaning so absolute that a court may accept it without regard to the context or circumstances in which the word was used. If what the plaintiff says is true, and at this point we must accept it, the word `involuntary' was not meant to, and therefore does not, include discharge without cause, especially one made in bad faith for the purpose of destroying plaintiff's option."
 
 
 20
 Gaines v. Monroe Calculating Mach. Co., Inc., 188 A.2d at 185. The court went on to say:
 
 
 21
 "* * * it is inconceivable that the parties meant by the word `involuntary' that plaintiff took the risk of losing $75,000 if defendant chose to discharge him at any time, even within a few days or weeks, and without cause."
 
 
 22
 Gaines v. Monroe Calculating Mach. Co., Inc., 188 A.2d at 186.
 
 
 23
 Other courts have held that an optionee, who has given full consideration under a stock option agreement, has an absolute right or a vested right to exercise the option despite the broad termination language employed by the optionor in the agreement. O'Brien v. United Home Life Insurance Co., 147 F.Supp. 761 (E.D.Mich.1957), aff'd 250 F.2d 483 (6th Cir. 1958). For a review of the related cases adhering to the vested rights' theory, see Lucas v. Seagrave Corporation, 277 F.Supp. 338 (D.Minn.1967).
 
 
 24
 It is our conclusion that the interpretation of the Stock Option Agreement urged by IBP would not be sustained by the Iowa court. We cannot believe that the parties here intended that the optionee give full consideration under the Agreement and then be deprived of his right to exercise the option by the sale of his employment contract. As we interpret Section 5 of the Agreement, it does not mean that termination of the option could result from the sale of the optionee's employment contract without prior notice thereof to the optionee.
 
 
 25
 It may be, however, that the parties, at the time of contracting, never put their minds to the question of sale of an employment contract. We do not believe that this would alter the decision of the Iowa court because, in such an instance, it has been held that the employee "should have the advantage of his boss's language." Ulmann v. Sunset-McKee Company, 221 F.2d 128, 133 (9th Cir. 1955). See also Freese v. Town of Alburnett, 255 Iowa 1264, 125 N.W.2d 790, 793 (1964).
 
 
 26
 IBP argues that the language of Section 5 is clear and that this Court is permitted to construe contractual language only when it is ambiguous. The Iowa Supreme Court rejected a similar argument in Hamilton v. Wosepka, Iowa, 154 N.W.2d 164 (1967), agreeing with Wigmore's statement that such a rule is only a "vestigial remain of a notion prevailing in `primitive law.'" Hamilton v. Wosepka, 154 N.W.2d at 171. The court went on to cite with approval the language used in United States v. Lennox Metal Manufacturing Co., 225 F.2d 302, 310-311 (2d Cir. 1955):
 
 
 27
 "* * * `Any such rule, like all rules of interpretation, must be taken as a guide, not a dictator. The text should always be read in its context.'"
 
 
 28
 Hamilton v. Wosepka, 154 N.W.2d at 172.
 
 
 29
 Hamilton v. Wosepka, supra, reviewed the rules of construction to be used as an aid in contract interpretation. We have adhered to those principles here.
 
 
 30
 IBP argues that the exercise of the stock option here is limited by Sections 421 through 425 of the Internal Revenue Code, 26 U.S.C. §§ 421-425. We reject this argument. No reference is made to the Internal Revenue Code in the Stock Option Agreement. The tax provisions, therefore, are relevant only to the tax status of the plan. Lucas v. Seagrave Corporation, supra.
 
 
 31
 Our interpretation here does not end the matter, however. A question remains as to the damages recoverable for breach of the Agreement. This issue was neither briefed nor argued on this appeal. We, therefore, express no opinion on the issue and remand it for determination by the District Court.
 
 
 32
 II. BONUS.
 
 
 33
 Gardner's 1961 employment contract with IBP provided for additional compensation in the form of a bonus. He received a bonus at the end of each succeeding fiscal year except the one ending October 30, 1965. Gardner contends that he should have received a bonus for that year as well. The District Court held that there was sufficient evidence from which the jury could determine whether there was an arrangement to pay the bonus, as well as the amount of such a bonus. The jury returned a verdict in the sum of $5,000 for Gardner.
 
 
 34
 On appeal, IBP argues that its bonuses were given on an empirical basis with regard to the employee's performance and the profitability of the plant at which he worked and not with regard to a fixed formula. In support of its argument, IBP cites Drake v. Block, 247 Iowa 517, 74 N.W.2d 577 (1956), which denied an attempt to recover a bonus because the method employed for the payment of bonuses was too "indefinite and uncertain." Drake v. Block, 74 N.W.2d at 580.
 
 
 35
 IBP's argument is not well taken. The record shows that there was sufficient evidence to submit the question to the jury. Gardner had received a bonus at the end of every fiscal year that he had worked for IBP except for the year at issue; all of the other plant managers received bonuses for the year at issue; employee compensation figures and plant profitability figures were given for the years prior to the year at issue and for that year as well. The District Court did not err in submitting the question to the jury. Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 90 L.Ed. 916 (1946).
 
 
 36
 Reversed and remanded for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 This action was begun by M. R. Gardner. Gardner died on April 28, 1967, and his wife, Maryjo Feldmiller Gardner, was substituted as party plaintiff. She has since remarried and her proper name is now Maryjo Feldmiller Langer
 
 
 [2]
 On October 1, 1965, there was a two for one stock split of the IBP stock. Gardner's stock option thereafter pertained to the purchase of 200 shares for $1,615
 
 
 [3]
 Section 3 of the Stock Option Agreement permits transfer of the option by will or by the laws of descent and distribution
 
 
 [4]
 See: McClung v. Thompson, 401 F.2d 253 (8th Cir. 1968); Universal Fiberglass Corp. v. United States, 400 F.2d 926 (8th Cir. 1968); LaFontaine v. Developers & Builders, Inc., Iowa, 156 N.W. 2d 651 (1968); Boyer v. Iowa High School Athletic Association, 260 Iowa 1061, 152 N.W.2d 293 (1967); Marty v. Champlin Refining Co., 240 Iowa 325, 36 N.W.2d 360 (1949)
 
 
 [5]
 See: Eddy v. Prudence Bonds Corporation, 165 F.2d 157, 163 (2d Cir. 1947), cert. denied, 333 U.S. 845, 68 S.Ct. 664, 92 L.Ed. 1128 (1948); General Casualty Company of Wisconsin v. Hines, Iowa, 156 N.W.2d 118 (1968); Schlotter v. Leudt, 255 Iowa 640, 123 N.W.2d 434 (1963); 3 Corbin on Contracts § 554 (1960)
 
 
 [6]
 In paragraph one of IBP's Incentive Stock Option Plan For Key Personnel, a document separate from the Stock Option Agreement between IBP and Gardner, it is stated:
 "1. Purpose. This Incentive Stock Option Plan for Key Personnel (the `Plan') of Iowa Beef Packers, Inc. (the `Company') is intended to advance the interests of the Company by providing officers and other key employees having substantial responsibility for the direction and management of the Company with an additional incentive and to encourage stock ownership, to increase their proprietary interest in the success of the Company, and to encourage them to remain in its employ."