No. 42,458

THE JOHNSON COUNTY NATIONAL BANK AND TRUST COMPANY, as trustee under that certain trust indenture dated April 28, 1956, between George W. Bach and Mary Kathryn Bach, settlors, and said bank as trustee, *Appellee*, v. GEORGE W. BACH, BARBARA KATHRYN BACH TAFF, STEPHEN BACH, THOMAS BACH, NANCY LYNNE BACH, and the unknown heirs and issue of George W. Bach, Mary Kathryn Bach, Barbara Kathryn Bach Taff, Stephen Bach, Thomas Bach and Nancy Lynne Bach, *Appellees*, and MARY KATHRYN BACH, *Appellant*.

(369 P. 2d 231)

Opinion filed March 3, 1962.

H. *Thomas Payne*, of Olathe, and *George L. Gisler*, of Kansas City, Missouri, argued the cause, *Howard E. Payne, W. C. Jones* and *Robert P. Anderson*, all of Olathe, were with them on the briefs for the appellant.

*Alvin D. Shapiro*, of Kansas City, Missouri, argued the cause, *John W. Breyfogle*, of Olathe, and *Dick H. Woods*, of Kansas City, Missouri, were with him on the briefs for the appellee, The Johnson County National Bank and Trust Company.

*Rice Lardner*, of Olathe, argued the cause and was on the briefs as guardian *ad litem* for Barbara Kathryn Bach Taff, Stephen Bach, Thomas Bach, Nancy Lynne Bach, and the unknown heirs and issue, etc., appellees.

The opinion of the court was delivered by

SCHROEDER, J.: This is an appeal from a declaratory judgment entered by the court below construing a trust agreement, wherein the parties to a divorce action made a property settlement which provided for reduced income to the wife upon remarriage, and holding a subsequent bigamous marriage by the wife, later declared void by a decree of annulment, to be a remarriage under the terms of the trust agreement.

The question is whether the wife *remarried* within the meaning of that term as used in the trust instrument. This depends primarily upon a construction of the agreement; that is, the intention of the parties as expressed therein.

The trust instrument, which is the subject of the declaratory judgment action, was entered into as the principal consideration of a property settlement agreement in a divorce action between Mary Kathryn Bach (defendant-appellant) and George W. Bach (defendant and one of the appellees) as the settlors, in 1956. A divorce was granted to the wife, and she accepted the provisions of the trust in lieu of alimony in the divorce action. Both the husband and the wife contributed jointly to the corpus of the trust estate.

The Johnson County National Bank and Trust Company of Johnson County, Kansas, (plaintiff and one of the appellees) was a party to the agreement as the trustee, and simultaneously with the execution of the agreement certain property, described in the schedule attached thereto, was *irrevocably* delivered to the trustee, the

corpus and all income therefrom to be held, administered and distributed as therein provided.

Among the provisions of the trust, dated April 28, 1956, were the following:

(*a*) "The trustee shall pay, at convenient intervals but not less frequently than quarter annually, all of the net income derived from the trust estate to MARY KATHRYN BACH *until her death if she does not remarry, or until her remarriage if she should remarry.*" (Emphasis added.)

(*b*) In the event Mrs. Bach remarried the trust was to be divided into shares. She was to continue to receive during her lifetime the income from three-fifths of the trust estate set apart as her share, and the balance of the estate was to be divided into four equal shares for the benefit of the settlors' four children. The trust for each child was to continue until such child became thirty-five years of age.

(*c*) Upon the death of Mrs. Bach her share, whether three-fifths or the entire corpus, is to be distributed to the four children or their issue.

(*d*) The trust was so drawn that neither the income nor the corpus of the trust could ever revert to George W. Bach or to his estate.

(*e*) The trustee is authorized and empowered to invade the corpus of the trust to the extent it deems necessary, if the trustee should conclude that further funds, in addition to the net income derived from the trust, are needed for the comfortable maintenance and support of Mrs. Bach while she is entitled to all of the net income, or for the comfortable maintenance, support or education of the children; provided, however, that the trustee is not authorized to invade the corpus for the benefit of the children without the prior written consent of Mrs. Bach. It further provided that any sums so paid or used should not be deemed advancements upon any payments of income.

The record discloses that George W. Bach has taken care of their four children since the time of the divorce decree, and that the oldest girl is now married, having gone through college. All of the children except one have gone to private high schools.

On July 2, 1958, the appellant (Mrs. Bach) and one Charles Edward Emerson were parties to a marriage ceremony in Cheyenne, Wyoming. Appellant, believing that she was actually married to Emerson, notified the trustee that she had married. Subsequent

thereto it was ascertained that Emerson had a wife then living from whom he was not divorced, and that he had no legal capacity to marry the appellant. Upon learning this fact the appellant instituted an annulment action in the Superior Court of the State of Arizona, and on the 28th day of May, 1959, that court entered a decree declaring the purported marriage of July 2, 1958, "null, void and of no effect whatsoever in law or equity." It ordered the purported marriage "annulled, set aside, held at naught, and declared void *ab initio*." In its decree the Superior Court of Arizona declared further that the appellant and Charles Edward Emerson were not and never had been husband and wife.

The appellant thereupon notified the trustee of the annulment. In the meantime the trustee had divided the trust estate into shares, but had not then, and has not now, distributed any of the income to the children. The trustee, nevertheless, refused to pay the appellant the entire income from the trust estate. The petition for declaratory judgment was thereafter filed by the appellee trust company to determine the rights of the appellant, the other beneficiaries, and the duties and obligations of the trustee.

(The over-all earning power of the trust from January 1, 1958, to the date of the hearing, September 1, 1960, was $12,581.26.)

The trial court held, notwithstanding the annulment of the purported marriage and the lack of capacity of one of the parties to enter into the marriage relationship, the purported marriage constituted a "remarriage" under the terms of the trust instrument; that the trustee had rightfully divided the corpus of the trust estate; and that the appellant was entitled only to three-fifths of the income from the trust following the void marriage ceremony.

While the trustee does not claim that it has changed its position to its detriment by reason of the purported remarriage, it does contend that the division of the assets in the trust estate was more than a bookkeeping transaction. In making the division the corpus was split into five parts, each of which had a separate account code number; new securities and new certificates were obtained; and each of the five shares received separate income tax treatment.

The appellant contends the word "remarriage" or "remarry" as used in the trust instrument can only mean another marriage; that is, a new *status* acquired as the result of a contract. Such status, it is urged, can be acquired only through a legally valid contract. Here, it is said, no such status was acquired because the contract

was legally void—one of the parties lacking capacity to marry, and the absolute prohibition of the law against such bigamous marriage. It is argued that it would be inconceivable that the appellant, as one of the settlors of the trust, intended that her right to income from the trust would be diminished by a marriage ceremony not only declared void in the eyes of the law, but to which criminal penalties would attach had it not been for her lack of knowledge that Emerson had a wife from whom he had not been divorced.

We note the situation presented by the instant case is unlike any of the cases to which we have been cited by either of the parties. Here the sole provision for the support of the wife was income from a trust estate irrevocably established—a trust estate to which the wife had made a substantial contribution of her own property. Clearly, there is no manifestation by the trust instrument, or the conduct of the parties, that any attempt was being made by the settlors to bargain away the duty of the father to provide for the support of their four children.

The interest of the children in any income from the trust estate during the life of the appellant is wholly *contingent* upon the happening of a specified event. As to this right the children are *contingent donee beneficiaries*. This interest in the trust is to be distinguished from the remainder over to the children after the death of the appellant.

Under Kansas law a marriage where one of the parties at the time has a husband or wife living is *void, absolutely and in all its aspects.* It requires no judgment of divorce or of nullity to render it void. It is void inherently and from the beginning. The innocent party may, however, maintain an action in equity to have such colorable marriage declared null and void. (*Fuller v. Fuller,* 33 Kan. 582, 7 Pac. 241.) In *Powell v. Powell,* 18 Kan. 371, the court, speaking of a void marriage for want of mental capacity on the part of one of the parties, said: "Not only was there no marriage *de jure,* but it would also be a misnomer to call it a marriage *de facto,* although law-writers thus frequently designate it." (p. 379.) (See, also, *Werner v. Werner,* 59 Kan. 399, 53 Pac. 127; *Browning v. Browning,* 89 Kan. 98, 130 Pac. 852; and 35 Am. Jur., Marriage, § 148, p. 271.)

A void marriage may be treated as void by the parties to it and by all the world. It is good for no legal purpose, and is not attended or followed by any of the incidents of a valid marriage. A

decree or adjudication of annulment for a void marriage is supported because conducive to good order and decorum, and to the peace and conscience of the party seeking it. (*Powell v. Powell,* supra.) An annulment has the effect of declaring the marriage relation void *ab initio.* (See, *In re Estate of Crump,* 161 Kan. 154, 166 P. 2d 684.)

Upon the record here presented the parties concede the law of Wyoming, where the bigamous marriage took place, and the law of Arizona, where the decree of annulment was procured, to be the same as the law of Kansas. We give full faith and credit to the Arizona decree, but construction of the trust instrument is a matter to be determined by Kansas law.

While the Kansas authorities agree with the general effect of a void marriage, no Kansas cases deal specifically with the effect of a void marriage upon a nuptial agreement or trust agreement, as here, conditioning payments upon remarriage.

Cases relied upon by the parties are selected from those accumulated in 48 A. L. R. 2d 270, 276, under an annotation entitled "Alimony as affected by wife's remarriage, in absence of controlling specific statute," and in 48 A. L. R. 2d 318, 329, under an annotation entitled "Remarriage of wife as affecting husband's obligation under separation agreement to support her or to make other money payments to her."

In *Sutton v. Leib* [1952], 199 F. 2d 163, 33 A. L. R. 2d 1451, a former wife sought recovery of unpaid installments of alimony imposed upon a defendant by an Illinois divorce decree as long as the former wife remained unmarried. The plaintiff and a third party subsequently entered into a marriage ceremony in Nevada which was annulled by a New York court, having jurisdiction of the parties, as void *ab initio* on the ground the second husband had another wife living at the time of the ceremony. Bigamous marriages were also void under Nevada law. In holding that the defendant was not relieved from his obligation to pay alimony between the void marriage and the annulment, and thereafter until a subsequent valid marriage, the United States Court of Appeals, Seventh Circuit, said:

". . . This is in accord with Illinois decisions which have consistently held that a void marriage, as distinguished from a voidable one, is an absolute nullity for all purposes, and no judicial proceedings or decree are required to establish its invalidity. . . . It follows that such a void marriage would be ineffectual to alter the marital status of either party to it, and that one

who participated in it, if otherwise unmarried, would 'remain unmarried.' We find no escape from this conclusion in the holding of the Illinois court in *Lehmann v. Lehmann*, 225 Ill. App. 513, also referred to by the Supreme Court, since that case, like the Sleicher case, involved a voidable rather than a void marriage. Once it is established, as the Supreme Court established in this case, that the marriage was void from its inception in Nevada where it was performed, because Nevada declares bigamous marriages void, then it seems simple to apply the Illinois law, that a void marriage is a nullity which creates no rights and duties between the parties and effects no change in the marital status of either. That being true, it cannot be relied upon by a third party, as defendant here, to relieve him of a continuing obligation which was never interrupted by the inefficacious marriage ceremony in Nevada." (pp. 164, 165.)

Similarly, in *Brenholts v. Brenholts* [1935, App.], 19 Ohio L. Abs. 309, 48 A. L. R. 2d 298n, 332n, the court construed a separation agreement incorporated in a divorce decree, where a subsequent bigamous marriage was declared void by a decree of annulment. The phrase "until she remarries" was construed to mean the *status* of marriage—that the former wife had acquired no marital status as a result of the void ceremony and that she had not remarried.

In *Sleicher v. Sleicher* [1929], 251 N. Y. 366, 167 N. E. 501, a divorce decree incorporated a separation agreement wherein the husband agreed to pay the wife a monthly sum to continue so long as she remained unmarried. When the wife's second marriage had been annulled for *fraud* the court held that she was entitled to a resumption of payment, but could not recover alimony payments accruing during the existence of her second marriage. It should be noted this case involved a *voidable* and not a void marriage.

Subsequent to the *Sleicher* case in 1940 the State of New York adopted a statute authorizing the court in an action for annulment to give such direction for support of the wife by the husband as justice requires. Thereafter, in *Gaines v. Jacobsen* [1954], 308 N. Y. 218, 124 N. E. 2d 290, 48 A. L. R. 2d 312, the husband's obligation was held to be terminated by the wife's remarriage, even though subsequently annulled as bigamous. The *Sleicher* case was distinguished on the ground it was impossible at that time, absent the statute, for a wife to obtain alimony or other support upon annulment of a marriage.

In speaking of the effect of remarriage on alimony decrees the annotator in 48 A. L. R. 2d, at page 296, says:

"In considering whether the invalidity of the subsequent marriage may be relied upon as a factor tending to establish a wife's continuing right to alimony

from a divorced prior husband, attention has been given to the practical question whether the wife is entitled to alimony from the subsequent, invalid marriage, it being quite apparent that if such alimony is payable, or is being paid, an invalid remarriage affords no more reason for continuation of alimony than does a valid one, the real question being whether by termination the wife would be cut off from all support."

A few courts when confronted with this difficult situation have adopted the position that "remarriage" means any kind of marriage *ceremony*, and not a valid marriage giving rise to a status. They say it is *the fact* of the ceremonial remarriage that is in the minds of the parties. Other courts apply principles of estoppel and laches upon giving the matter equitable consideration. Some courts have resorted to "sound principles of justice" to avoid unfortunate decisions.

The appellees contend the words "remarriage" and "remarry" as used in the trust indenture refer to the act of remarriage and not to the relation which exists thereafter. In other words, they say, the trust instrument looked to a certain event, not to the relation resulting from that event. In pursuing this position they argue the Arizona decree of annulment declared null and void the marriage, or status, which existed after the act of remarriage, but it did not, and could not, affect the rights of third persons whose rights vested upon the happening of the *act* of remarriage. That is to say the vesting condition was the *act* of remarriage, not the ensuing *relation*.

The primary purpose of the trust, as we construe the trust instrument, was to provide for the support and welfare of the immediate beneficiary, Mrs. Bach, with a gift over to the children in the event of her death. To fulfill this primary purpose the trustee is authorized to invade the corpus of the trust estate, even though the result might be detrimental to subsequent beneficiaries. If there was to be an alteration in the primary purpose by making a reduction in the income payments to Mrs. Bach in the event of her remarriage, it was the intention of the parties to substitute another source of income for her support in its stead. This could be accomplished only by a *valid* marriage, one which gives rise to marriage status. The event or contingency of *remarriage*, therefore, within the contemplation of the parties to the trust agreement required the creation of a *valid marriage status*. This, in our opinion, was the intention of the parties expressed therein.

The appellees argue that whatever the effect of the Arizona decree annulling the appellant's remarriage may have been as against

the parties thereto, it cannot affect the rights of third parties whose rights had previously vested upon the occurrence of the vesting condition; that is, the appellant's remarriage.

The argument of the appellees throughout their brief fails to distinguish between a marriage which is *voidable*, such as a marriage induced by fraud where one of the parties has an option to continue the marriage or to set it aside, and a marriage which is absolutely *void*, such as here a bigamous marriage. No decree is necessary to declare a bigamous marriage void. Under the law applicable to this case it was impossible for the appellant to marry Emerson. There being no marriage, other than the inefficacious marriage ceremony in Wyoming, the condition precedent to the vesting of rights in third persons did not occur. Under these circumstances the rights of third persons could not have been affected by the Arizona decree of annulment.

The appellees rely upon the doctrine of "relation back"—that a decree of nullity relates back so as to render the marital relation void from its inception. Here again, nearly all of the cases cited to support the argument on this point, and the language to which reference is made in them, pertain to a *voidable* marriage. (*Sefton v. Sefton*, 45 C. 2d 872, 291 P. 2d 439; *Williams v. State*, 25 N. Y. S. 2d 968, 175 Misc. 972; *Sleicher v. Sleicher*, supra; and others.) It is further argued that regardless of the rights and duties as between the parties to the purported marriage, third persons are not adversely affected by a proceeding to which they were not parties (here the Arizona decree). Again the appellees rely upon the doctrine of "relation back." The appellees having acquired no additional rights under the trust instrument by reason of the *void* marriage, the Arizona decree did not affect their rights. They were not interested parties.

In the early case of *Powell v. Powell*, supra, in 1877 the court reviewed the effect of a decree of nullity and the ramifications of a marriage void *ab initio*, and said: "A sentence of nullity like this would strip her of all alimony, deprive her of all interest in the property of defendant, and bastardize her children." (p. 380.) (See, also, *Fuller v. Fuller*, supra.) Subsequently by statute children of a void or voidable marriage were legitimatized. (G. S. 1949, 23-124 and 60-1515.) But this affected only the children of such marriage and touched no other parties. It does not follow, as appellees contend, that these statutes are authority for the proposition

that the legislature has declared the rights of third parties cannot be affected by annulment.

If our legislature had wished to limit the effect of a decree of nullity as to other third parties, it could have done so by enacting a statute similar to California. Section 86 of the California Civil Code provides: "A judgment of nullity of marriage rendered is conclusive only as against the parties to the action and those claiming under them." (See, *Price v. Price* [1938], 24 C. A. 2d 462, 75 P. 2d 655; and *Sefton v. Sefton,* supra.)

It is argued by the appellees that a reversal of the judgment of the trial court would force trustees and executors making distributions upon "remarriage" to do so at their peril. They say it is not difficult to envision a situation where a trustee or executor may have long been paying out income, or may have distributed the corpus to various beneficiaries, only to learn some years later that the "marriage" or "remarriage" has been declared void *ab initio.*

The problems suggested by the appellees are not involved in this case. The trustee has paid no money out in reliance upon the fact that there was a remarriage. As a legal proposition neither the trustee nor the children have changed their positions. The costs incurred by the trustee in dividing the trust estate into shares, and those which may be encountered in changing the estate back to its original status on the books, are expenses of administration of the trust estate and recoverable to the trustee, as such, out of the earnings of the trust. The problems raised by the appellees can easily be faced by a court of equity when they arise. There are ample resources for solutions in the doctrine of estoppel, laches and other equitable doctrines. Certainly, if the trustee had made distributions to the children in reliance upon Mrs. Bach's belief and notice that she was married, the court could apply estoppel or another doctrine to protect the trustee from demands as to any distribution actually made in good faith. (See, 55 C. J. S., Marriage, § 38.)

In conclusion we hold the appellant is entitled to the income from the entire trust from the date of the void marriage ceremony.

The judgment of the lower court is reversed.

ROBB, J., dissents.