**Lela R. PETERS, Appellee,**

v.

**Bill L. PETERS, Appellant.**

**No. 55911.**

Supreme Court of Iowa.

Jan. 16, 1974.

Ed Skinner, Irish, Skinner & Wieslander, Altoona, for appellant.

Robert G. Bridges, Bridges & Bridges, Des Moines, for appellee.

McCORMICK, Justice.

Plaintiff Lela R. Peters and defendant Bill L. Peters were divorced September 25, 1968. The decree required Bill to pay alimony to Lela until December 31, 1985, the obligation to terminate earlier upon Lela's death or remarriage. The question presented now is whether an annulled marriage of Lela was a remarriage cutting off alimony under that decree. Trial court held it was not. We affirm.

The alimony provision was contained in a stipulation of the parties approved and incorporated in the divorce decree. Lela received custody of their two minor children. Bill received the home, household goods, all checking and savings accounts in his name or owned jointly and all of his very substantial business investments and assets. Lela obtained only her own personal property, a car in her name and personal bank accounts. As child support Bill was ordered to pay $100 per month until the younger child's eighteenth birthday and was authorized to claim the children as dependents for income tax purposes. As alimony Bill was ordered to pay $12,000 for the period ending December 31, 1968, $21,600.00 per year in equal monthly installments in 1969 through 1972, $6000.00 per year in equal monthly installments in 1973 through 1982, and $3000 per year in equal monthly installments in 1983 through 1985, after which all alimony payments would cease.

The children of the parties are Stacy Frances, born April 30, 1964, and Jay Lawrence, born July 19, 1967. The $21,600 annual alimony payments approximately covered the period until the younger child reached school age. The $6000.00 annual alimony payments approximately cover the period until the older child is 18 and presumably out of high school, and the $3000 annual alimony payments approximately cover the remaining period until the younger child is 18.

Bill's adjusted gross income in 1970 was over $83,000.00 and in 1971 over $72,000.00.

At issue here is a provision that "all alimony payments shall cease upon the * * * remarriage of Lela Peters."

On May 11, 1972, Lela caused a contempt citation to issue charging Bill was $16,700 in arrears in alimony payments. Bill admitted the arrearage but defensively alleged Lela's remarriage. Hearing was held May 23, 1972 before the same judge as had entered the divorce decree. The case was tried in equity. Our review is de novo. Rule 334, Rules of Civil Procedure.

The record shows that after the divorce Lela moved with the children to Tulsa, Oklahoma. Although some payments were not timely made, alimony was current as of October 1971. At that time Bill was called to Tulsa by one Ted Murray who allegedly expressed concern about Lela's care of the children. While in Tulsa, Bill was told by Murray he intended to marry Lela. Bill testified he withheld alimony payments from October 1971 because of his uncertainty about Lela's status. He was also attempting to negotiate an alimony settlement through Lela's accountant in Tulsa. At no time did Bill ask Lela if she was married, even though he had at least one telephone conversation with her during this period. Lela testified Bill told her in De-

cember 1971 he had to wait for a loan to go through before he could pay what he owed her. It was not until April 28, 1972, that he learned Murray and Lela were married in Texas on February 16, 1972.

Lela testified she was on her way to vacation with Murray and another couple in Mexico for two weeks on February 16, 1972, when without prior planning they stopped off in Laredo, Texas, and she and Murray went through a marriage ceremony before a justice of the peace. She said she was intoxicated at the time; the marriage was not consummated; Murray left on foot during the evening; she and the other couple remained that night in Laredo; and she returned to Tulsa with them the next day. She asserted she next heard from Murray the day after her return when he called and asked if she wanted the marriage annulled. She told him she did. She testified she proceeded to obtain an annulment in Texas which was received May 2, 1972, on the basis of her intoxication. The Texas annulment decree provided that the marriage be "dissolved, annulled, set aside and declared void because entered into by [Lela] while under the influence of alcohol."

There is no evidence she cohabited with Murray after the ceremony, or received any support from him, or represented herself to anyone as his wife.

Trial court held the annulled Texas marriage was not a remarriage within the terms of the divorce decree:

"This Court holds that 'remarriage' as used in this decree means to enter a valid marriage contract and the purpose of such a provision is to end the alimony payments upon a remarriage that would normally provide another source of support. This could not be accomplished by the annulled marriage in this case. The * * * decree in this case contemplated a valid and subsisting remarriage."

Bill was exonerated of contempt because the court found his failure to pay alimony was not willful. That question is not before us since Lela did not appeal. The alimony arrearage to February 16, 1972, was paid.

■ I. Although Bill's right to appeal the decree exonerating him of contempt is not challenged, we believe it is necessary to discuss that issue. It is our duty to refuse unauthorized appeals on our own motion, and as a general rule the right of appeal is denied one who is not prejudiced or aggrieved by the decision from which appeal is taken. Eden Township Sch. Dist. v. Carroll County Bd. of Ed., 181 N.W.2d 158, 163 (Iowa 1970).

■ Whether Bill was prejudiced or aggrieved by the decision depends upon interpretation of trial court's ruling that his alimony obligation was not terminated by Lela's Texas marriage. If viewed as a mere adverse finding such a ruling is deemed not adjudicative and thus not prejudicial to a party who has won his case. However, if the adverse ruling is included in the decretal portion of the decree, it is an adjudication and may be appealed. Iowa Public Service Co. v. Sioux City, 254 Iowa 22, 116 N.W.2d 466 (1962). It is only the decretal portion of the decree that constitutes an adjudication. Wolf v. Murrane, 199 N.W.2d 90, 95 (Iowa 1972). The mere fact a party has prevailed on the immediate issue decided by the decree does not preclude his right of appeal if it also adjudicates his rights in a manner prejudicial to him. 4 Am.Jur.2d Appeal and Error § 184; 4 C.J.S. Appeal and Error § 183(3), at p. 567.

■ Thre is no doubt, as the parties apparently agree, Bill won the battle but lost the war under trial court's decree. The ruling that his alimony obligation was not ended by Lela's Texas marriage was integral to the adjudicative portion of the decree. It was an adjudication rather than a mere adverse finding. Since that adjudication adversely affected his interest, it was prejudicial and therefore appealable.

■■ II. We also note the failure of either party to plead Texas law although they agreed Lela's annulment was governed by Texas law. She offered evidence to prove the applicable Texas law without objection by Bill that it was inadmissible because not pleaded. We ordinarily do not consider foreign law in the absence of pleading and proof. Eddards v. Suhr, 193 N.W.2d 113, 115 (Iowa 1971); rule 94, R.C.P. However, where as here the parties proceed without objection to try an issue not presented by the pleadings, it amounts to consent to try that issue "and it is rightfully in the case." In re Estate of Millers, 159 N.W.2d 441, 446 (Iowa 1968).

III. The decisive question in this case is whether Lela's annulled Texas marriage was a remarriage which cut off her right to alimony from Bill under the divorce decree.

Each party relies on a number of cases asserted to be controlling. Lela's principal authority is DeWall v. Rhoderick, 258 Iowa 433, 138 N.W.2d 124 (1965), a case of first impression in this state. There with a similar provision in the decree we held a bigamous second marriage was not a remarriage which cut off alimony. We noted the attempted remarriage was void under our statute.

■ Bill argues the DeWall case is distinguishable because under Texas law Lela's remarriage was voidable rather than void. This is what Texas law provides. The relevant statute is Vernon's Texas Code Ann., Family Code § 2.42 (1970 Supp.):

"On the suit of a party to a marriage, the marriage is voidable and subject to annulment if:

(1) at the time of the marriage the petitioner was under the influence of alcoholic beverages or narcotics and as a result did not have the capacity to consent to the marriage; and

(2) the petitioner has not voluntarily cohabited with the other party to the mar-

riage since the effects of the alcoholic beverages or narcotics ended."

Bill recognizes we give full faith and credit to the Texas annulment decree but correctly points out the effect of that decree on his alimony obligation under the Iowa divorce decree is a question of Iowa law. See Sutton v. Leib, 342 U.S. 402, 72 S.Ct. 398, 96 L.Ed. 448 (1952).

■ When a marriage is void it is (for most purposes) as if no marriage had taken place. In theory it does not need to be judicially annulled. However, when a marriage is voidable it is legally valid for all civil purposes until it is judicially annulled. DeWall v. Rhoderick, supra. Bill contends Lela's marriage was a remarriage under the decree because it was a valid marriage until annulled at Lela's election.

In DeWall we relied in part on Sleicher v. Sleicher, 251 N.Y. 366, 167 N.E. 501 (1929). In that case the wife's second marriage had been annulled on the ground of the husband's fraud in concealing his insanity. The marriage was voidable rather than void. Chief Justice Cardozo compared annulment of a voidable marriage to rescission of a contract, noting it puts an end to the marriage from the beginning for purposes of justice. After Sleicher a statute was enacted in New York permitting a wife to obtain support from an annulled marriage whether void or voidable. Subsequently, in Gaines v. Jacobsen, 308 N.Y. 218, 124 N.E.2d 290 (1954), the New York court refused to follow Sleicher, reasoning that the purposes of justice were better served by limiting the wife to her right of support from the annulled marriage.

In DeWall we distinguished Gaines v. Jacobsen on the basis that our statute did not permit alimony from an annulled marriage. At that time were were unaware of a New York decision filed a few days before in which the New York court held either a void or voidable ceremonial marriage is sufficient to cut off alimony even without a right of support from the an-

nulled marriage. See Denberg v. Frischman, 24 A.D.2d 100, 264 N.Y.S.2d 114 (1965), aff'd, 17 N.Y.2d 778, 270 N.Y.S.2d 627, 217 N.E.2d 675 (1966), cert. denied, 385 U.S. 884, 87 S.Ct. 176, 17 L.Ed.2d 111.

Thus we must decide whether we will follow the new path of the New York court. Several other jurisdictions have done so. They have adopted an inflexible rule that where by statute or decree the alimony obligation terminates upon remarriage it ends automatically when the supported spouse subsequently enters a void or voidable marriage and is not revived by annulment of the subsequent marriage.

Some of the decisions rest on statutory interpretation combined with arguments of policy. See, e. g., Fry v. Fry, 5 Cal.App.3d 169, 85 Cal.Rptr. 126 (1970); Flaxman v. Flaxman, 57 N.J. 458, 273 A.2d 567 (1971). In the absence of statute, others are based entirely on policy grounds. They maintain that even when the termination provision is found in the decree, a ceremonial marriage invariably and automatically terminates the alimony obligation. See, e. g., Surabian v. Surabian, 285 N.E.2d 909 (Mass.1972); Beebe v. Beebe, 227 Ga. 248, 179 S.E.2d 758 (1971); Chavez v. Chavez, 82 N.M. 624, 485 P.2d 735 (1971).

Still other cases decide the issue where an agreement or decree is involved by ascertaining the intention of the parties and the court. See, e. g., Johnson County Nat. Bank & Trust Co. v. Bach, 189 Kan. 291, 369 P.2d 231 (1962); Cecil v. Cecil, 11 Utah 2d 155, 356 P.2d 279 (1960); cf. Dodd v. Dodd, 210 Kan. 50, 499 P.2d 518 (1972).

We adopted this latter view in DeWall. The issue there was the meaning of a divorce decree like that in this case. We rejected the first husband's contention that a mere ceremony of marriage would terminate alimony and said, "We are convinced the evident intention of the parties and the court was that a change of status would be required." 258 Iowa at 440, 138 N.W.2d at 128.

We agree with the recent cases that the void-voidable marriage distinction is not controlling. It is unlikely the parties and court consider that distinction, especially under the law of other states, at the time a divorce decree is entered. The fact Lela's marriage was voidable rather than void under Texas law does not prevent application of usual principles of interpretation. However, we also reject the inflexible rule adopted in Denberg and its progeny.

Those cases substitute one extreme and rigid rule for another, based largely on policy grounds. They say a ceremonial marriage should be deemed sufficient as a matter of law to cut off alimony because the first husband is entitled to rely on the wife's remarriage and reorder his personal and financial affairs; the right to revive alimony by annulment gives the wife a choice of two means of support—alimony from the second marriage if she divorces or alimony from the first if she annuls; the vicissitudes of the second marriage should not affect the first husband; and he has no way to question the grounds of annulment. See Flaxman v. Flaxman, Chavez v. Chavez, and Denberg v. Frischman, supra. Most of these considerations are inapplicable in the present case. Bill did not know of the remarriage until four days before it was annulled. His personal financial affairs were unaffected. The fact that Lela could not have the marriage annulled if she cohabited with Murray after reaching sobriety ensured that Bill would not be misled by appearances. Further, Lela did not have choice of two means of support. No alimony is allowed in Texas even upon divorce. Brunell v. Brunell, 494 S.W.2d 621, 623 (Tex.Civ.App.1973). There is no evidence Lela did anything to take on either the prerogatives or responsibilities of remarriage.

This situation illustrates the fallacy of positing an inflexible rule in derogation of ordinary principles of equity. See Note, 29 So.Cal.L.Rev. 367, 368 (1956); cf. Glazer v. Silverman, 354 Mass. 177, 236 N.E.2d 199 (1968); Cecil v. Cecil, supra.

Such an approach amounts to judicial prejudgment of a situation which may be entirely different than that presupposed by it. It makes especially hard cases where the purported remarriage resulted from fraud. See Flaxman v. Flaxman and Chavez v. Chavez, supra. The same would be true in any case where the supported spouse entered the second relationship without volition, including cases involving coercion or mental illness. See § 598.29, The Code.

We believe there is a middle ground more appropriate to a court of equity than the extreme view of Sleicher or the equally extreme view of Denberg, and we adopt it. The first inquiry of the court ought to be addressed to the intent of the court in entering the divorce decree providing for termination of alimony upon "remarriage" of the supported spouse. We have said a decree is susceptible of interpretation on the same basis as other written instruments, the determinative factor being the intent of the court as gathered from the decree and other proper evidence. Sound Storm Ent. v. Keefe, In & For Fayette Cty., 209 N.W.2d 560, 566 (Iowa 1973), and citations. Even though the decree involved here approved the parties' stipulation, it is the decree and not the stipulation which creates whatever rights the parties have. Knipfer v. Knipfer, 259 Iowa 347, 350, 144 N.W.2d 140, 142 (1966).

In contrast to the position taken by the courts in such cases as Surabian v. Surabian, Dodd v. Dodd, and Chavez v. Chavez, supra, we recognize extrinsic evidence may be received to aid a court in interpretation of writings. Such evidence is received not to show the language means something different than what is said in the instrument involved but to show what is meant by what is said. Hamilton v. Wosepka, 261 Iowa 299, 154 N.W.2d 164 (1967); see Pappas v. Hauser, 197 N.W.2d 607, 611 (Iowa 1972).

In addition we recognize the advantage a trial court has in interpreting its own prior decree. We have said a court's construction of its own decree is given great weight in determining what the decree means. Cooper v. Cooper, 158 N.W.2d 712, 714 (Iowa 1968).

If the court's intent cannot adequately and fairly be ascertained through this first inquiry, then the next inquiry should be into the equitable and public policy considerations suggested by Denberg and related cases. In that situation, when the equities favor revival of alimony such should be ordered; when they do not it should be denied. This procedure is consistent with our general approach to matters cognizable in equity.

IV. In the present case trial court's order is supported by both inquiries. The judge who entered the divorce decree held his intent in using the word "remarriage" as a basis for cutting off alimony was that alimony would be ended only by Lela's entry into "a valid marriage contract * * * that would normally provide another source of support." He referred to remarriage as a status rather than a ceremony. Cf. Keeney v. Keeney, 211 La. 585, 30 So.2d 549 (1947). Trial court thus found Lela's annulled Texas marriage was not a remarriage as contemplated by the decree. We accord that interpretation great weight. Cooper v. Cooper, supra.

Examination of the alimony provision in the context of the entire divorce decree supports trial court's conclusion. Considering the property division in this case, Bill's substantial assets, the nominal child support notwithstanding his large income, and the manner in which alimony payments coincide with the period of the parties' child support responsibilities, it is clear the parties and court intended Lela would have her alimony income during the years she and Bill were obliged to support the children. Although the award was made to Lela for her support, the court would probably not have entered the decree requiring minimal child support unless convinced she would also apply alimony to provide a home for the children. The parties and court undoubtedly had in mind the income tax advantage to Bill in paying substantial sums as alimony rather than child

support. Alimony payments are deductible in full whereas dependency exemptions are not enlarged in proportion to the amount paid as child support. See Int.Rev. Code of 1954 (as amended) §§ 151(e)(1)(B), 215. In Bill's tax bracket that difference is of considerable consequence. Since the children's interests were inextricably involved in the alimony award it is unlikely the court contemplated it should be lost by the kind of marriage that occurred in this case.

Significantly, the decree provides the alimony obligation would be a charge against Bill's estate in the event of his death. This is additional assurance by the court that Lela would be supported during the period she would have the care of the children.

No extrinsic evidence was received bearing directly on the issue of intent, but we believe the record is sufficient to show Lela's annulled Texas marriage was not a "remarriage" as that word was employed in the divorce decree in this case.

As to the second inquiry, we have already explained in Division III, our reasons for believing, even if the case had to be decided by balancing the equities in light of public policy considerations, continuation of alimony would be warranted in this case.

Trial court's order was right.

Affirmed.

LeGRAND, UHLENHOPP, REYNOLDSON and HARRIS, JJ., concur.

RAWLINGS, MASON and REES, JJ., dissent.

MOORE, C. J., takes no part.

RAWLINGS, Justice (dissenting).

Being unable to agree with the reasoning in Divisions III–IV of the majority opinion and result reached I respectfully dissent.

I. As conceded by the majority, Gaines v. Jacobsen, 308 N.Y. 218, 124 N.E.2d 290 (1954), holds that the right to alimony under a prior divorce decree is terminated by subsequent marriage even though such remarriage, void or voidable, be annulled.

In support of that holding the court aptly stated, 124 N.E.2d 293–294:

"Since the function of alimony payments is to provide support for a wife not otherwise supported, the reason for such payments fails when the wife acquires a new source of support by remarrying, cf. Civ.Prac.Act, § 1172–c. And by a ceremonial marriage she receives the right to support—even though the circumstances are such that grounds for annulment exist—for the entire period that the parties live together as husband and wife, unless and until there is an actual judicial declaration of annulment. See Sleicher v. Sleicher, supra, 251 N.Y. 366, 370, 167 N.E. 501, 502; Bostick v. State, 1 Ala.App. 255, 55 So. 260; State v. Loyacano, 135 La. 945, 66 So. 307.

"The subsequent fortunes of the remarriage, and whether or not it is later terminated, are in no way material to the agreement; the husband's obligations are by its terms to continue only until she remarries, and there is nothing in the agreement which can serve as a basis for subsequently reviving those obligations. No one contends that they would be revived if the remarriage ended in divorce, see Nelson v. Nelson, 282 Mo. 412, 418, 221 S.W. 1066; Brandt v. Brandt, 40 Or. 477, 67 P. 508, and it is difficult to see any reason for a different result when it ends in annulment. It is certainly unlikely that the parties intended the result to turn upon whether an unsuccessful remarriage is deemed in law void—as is the one in this case, Domestic Relations Law, Consol.Laws, c. 14, § 6—or voidable Domestic Relations Law, § 7, or valid, until dissolved by a decree of divorce. Rather, the understanding must

have been that, upon the wife's remarriage, the husband could regard himself as free of the duty to support her. He could then assume new obligations—he could himself remarry, if he were of a mind to, but his means limited—without remaining forever subject to the possibility that his first wife's remarriage would be annulled and the burden of supporting her shifted back to him. And the wife, too, must have understood that by remarrying she abandoned her rights to support under the agreement, for better or for worse, in favor of whatever support would be furnished her by her second mate."

Subsequently, in Denberg v. Frischman, 24 A.D.2d 100, 264 N.Y.S.2d 114 (1965), New York reaffirmed *Gaines, supra,* and in so doing refuted the ad hoc or case by case approach here adopted by the majority with this statement, 264 N.Y.S.2d at 120:

"In final analysis, the courts do and must apply general rules to situations that come before them. To riddle the Gaines rule with exceptions to avoid a particular result in a particular case may produce a host of injustices in the cases to follow. To make such exceptions without a firm rational basis is even more perilous. * * * After all, it is the remarrying spouse who has stumbled, and who is to say where the genesis of the fault first arose."

See also Herscher v. Herscher, 51 Misc.2d 921, 274 N.Y.S.2d 295 (1966).

II. But even if the *Denberg* reasoning, quoted above, be disregarded there is another facet of the case before us which weighs heavily against the majority view. Noticeably the majority places great stress upon trial court's right to interpret its own decree. I suggest this is at best a dubious approach.

In the first place an examination of the record discloses trial court, in granting the divorce decree here involved, approved a stipulation entered into by Bill and Lela Peters. Property division and alimony provisions thereof were made a part of the decree. So, as to alimony, trial court did not here interpret its own decree but rather engaged in an interpretation of the separate agreement between plaintiff and defendant.

Next, as to alimony, the aforesaid stipulation provides:

"It is further mutually agreed that any and all alimony payments shall cease upon the death or remarriage of Lela Peters.

"It is further agreed that Lela R. Peters shall not be entitled, under any circumstances to receive an increase in alimony at any time hereafter and that she will never, under any circumstances make application to the Court therefore, * * * ."

Significantly, the above stipulated alimony-terminating-"remarriage" is devoid of any condition or qualification. Dodd v. Dodd, 210 Kan. 50, 499 P.2d 518 (1972), involved a situation peculiarly akin to that instantly presented. In resolving the problem thus posed, adverse to the majority position here taken, the Kansas Supreme Court said, 499 P.2d 522–523:

"Here the divorce decree approved and incorporated the parties' written separation agreement as to alimony. In Drummond v. Drummond, 209 Kan. 86, 495 P.2d 994, we had this to say respecting such agreements:

" 'The intent of the parties to a separation agreement is determined by the agreement when its terms are plain and unambiguous, and when the language is clear and unequivocal the meaning must be gleaned from its contents alone and words cannot be read into an agreement which import an intent wholly unexpressed when the agreement was executed.'

"We already indicated, we have no difficulty in concluding that the agreed

provisions for alimony are clear and unambiguous, leaving no room for outside matters to be used to change their meaning or to construe them. The agreement called for alimony payments 'until and unless such time as the death or remarriage of plaintiff nullifies this agreement', such payments to commence on a prescribed date and to continue 'until the death or remarriage of the plaintiff'; further it specifically cautioned appellee she could not look to appellant for financial assistance in the way of alimony or property in any manner inconsistent with the terms or in violation of the agreement.

"The agreement says nothing about the status of the remarriage and termination of the alimony is not made to turn on its validity. Nothing in the agreement evinces an intent to provide, as was the case in Johnson County National Bank & Trust Co. v. Bach, supra (189 Kan. 291, 369 P.2d 231), that if the arrangement therein provided was altered, to substitute in its stead another source of income for support which could be accomplished only through a valid marriage status. The agreement simply provided that alimony was payable until appellee remarried. The word 'Remarriage' is an ordinary one in common usage and the agreement contains nothing to indicate anything other than its use in its popular or conventional sense was intended. Certainly appellee must have understood that by remarrying she was abandoning her claim for support under the agreement, for better or for worse, in favor of whatever support would be furnished by her new spouse. Appellee remarried and the alimony ceased. There is nothing in the agreement which can serve as any basis for its subsequent revival * * *."

Finally on this subject, as the majority concedes, no extrinsic evidence was introduced bearing on intent of the parties hereto. Thus our holding in Hamilton v.

Wosepka, 261 Iowa 299, 305–314, 154 N. W.2d 164 (1967) is not here applicable.

III. Furthermore, there is to me no persuasive premise upon which to hold the relevant New York and Iowa laws are materially distinguishable.

Section 236, Domestic Relations Law, McKinney's Consol. Laws c. 14, formerly Section 1140-a of the New York Civil Practice Act states, in material part:

"In any action or proceeding brought (1) during the lifetime of both parties to the marriage to annul a marriage or declare the nullity of a void marriage, or (2) for a separation, or (3) for a divorce, the court may direct the husband to provide suitably for the support of the wife as, in the court's discretion, justice requires * * *."

And § 598.24 of the 1966 Iowa Code provided:

"In case either party entered into the contract of marriage in good faith, supposing the other to be capable of contracting, and the marriage is declared a nullity, such fact shall be entered in the decree, and the court may decree such innocent party compensation as in cases of divorce."

Additionally, the cited Iowa Code, § 598.14, said in relevant part: "When a divorce is decreed, the court may make such order in relation to the children, property, parties, and the maintenance of the parties as shall be right."

See also The Code 1973, Sections 598.32 and 598.21.

I submit the phrase, "the court may decree such innocent party *compensation as in cases of divorce*", contained in The Code 1966, § 598.24, quoted above, means nothing other than that on annulment of marriage the court, per § 598.14, "may make such order in relation to the children, property, parties, and the maintenance of the parties as shall be right."

Moreover, it is to me evident the referential clause, *"as in cases of divorce"*, found in § 598.24, quoted above, clearly and unambiguously expresses the foregoing true legislative intent. See Iowa R.Civ.P. 344(f)(13); State v. Prybil, 211 N.W.2d 308, 311 (Iowa 1973); Iowa Civil Rights Com'n v. Massey-Ferguson, Inc., 207 N.W.2d 5, 7 (Iowa 1973); McKillip v. Zimmerman, 191 N.W.2d 706, 709 (Iowa .1971); Goergen v. State Tax Commission, 165 N.W.2d 782, 786 (Iowa 1969).

IV. Neither can I agree with the majority when it unequivocally says: " * * * Lela did not have the choice of two means of support."

Admittedly alimony, as such, is not awarded by Texas courts upon the granting of a divorce or annulment of marriage decree. See Francis v. Francis, 412 S.W.2d 29, 32 (Tex.1967).

Also, as to the matter of "permanent alimony", Francis v. Francis says, 412 S.W.2d at 32: "In this State as in other states, alimony is an allowance for support and sustenance of the wife, periodic or in gross, which a court orders a husband to pay * * *."

On the other hand, as further stated in *Francis,* 412 S.W.2d at 33: "* * * obligations assumed by the husband in separation agreements or contracts to make payments for the support of the wife after a divorce decree becomes final, are not obligations to pay alimony and do not violate the public policy of this State." In other words support payments so ordered to be made are not deemed alimony in Texas. See Cornell v. Cornell, 413 S.W.2d 385, 387 (Tex.1967).

Additionally, Tex.Fam.Code 1970, § 3.63 states: "In a decree of divorce or annulment the court shall order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage."

Thus Lela was not without right to some relief in her Texas annulment action. See Tex.Fam.Code, § 3.63, quoted above.

In any event, the means by which Lela might have obtained compensation or support in connection with her Texas annulment is not here controlling. See 27A C.J.S. Divorce § 239(c), at p. 1147. Neither can the extent thereof, or share she could have had from the second husband's estate, be instantly determinative.

V. Finally, research also reveals the rationale in *Gaines,* quoted *supra,* has been either expressly or tacitly approved by a respectable array of courts in other jurisdictions. See generally Fry v. Fry, 5 Cal. App.3d 169, 85 Cal.Rptr. 126 (1970); Torgan v. Torgan, 159 Colo. 93, 410 P.2d 167 (1966); Beebe v. Beebe, 227 Ga. 248, 179 S.E.2d 758 (1971); Keeney v. Keeney, 211 La. 585, 30 So.2d 549 (1947); Surabian v. Surabian, 285 N.E.2d 909 (Mass.1972); Bridges v. Bridges, 217 So.2d 281 (Miss. 1968); Ballew v. Ballew, 187 Neb. 397, 191 N.W.2d 462 (1971); Chavez v. Chavez, 82 N.M. 624, 485 P.2d 735 (1971); Flaxman v. Flaxman, 57 N.J. 458, 273 A.2d 567 (1971). See also Evans v. Evans, 212 So. 2d 107 (Fla.App.1968); 21 Drake L. Rev. 645 (1972); 18 Drake L. Rev. 291 (1969); Annot., 45 A.L.R.3d 1033; cf. Nelson v. Nelson, 282 Mo. 412, 221 S.W. 1066, 1067 (1920).

VI. In light of the foregoing I see no reason to distinguish between divorce and annulment as here involved. And particularly under present day standards the wife should not be permitted the means by which to choose the more affluent of two marriage related sources of property allocation, alimony, maintenance or support.

VII. In the case at bar the record indicates nothing more than that Mrs. Peters' remarriage annulling intoxication was voluntary. Stated otherwise, there is no showing from which it may be inferred the second marriage vitiating inebriation resulted from the exercise of force, duress, or coercion by anyone. Neither is there

any basis upon which to find Mrs. Peters' remarriage was induced by fraud.

Under these circumstances I would adopt the rationale in *Gaines, supra,* and other like cases cited above, and reverse on the instant appeal.

REES, J., joins this dissent.

MASON, J., dissents for the reasons stated in Division I of the dissent by RAWLINGS, J.