In re the MARRIAGE OF Richard Henry CARLSON and Jacqueline Lee Carlson.

Upon the Petition of Richard Henry Carlson, Appellant,

and

Concerning Jacqueline Lee Carlson, Appellee.

No. 68613.

Supreme Court of Iowa.

Sept. 21, 1983.

Robert D. Hall and Thomas N. Martin, Ankeny, for appellant.

Susan L. Ekstrom, and Joseph B. Joyce of Adler, Brennan, Joyce & Steger, Des Moines, for appellee.

Considered by REYNOLDSON, C.J., and McCORMICK, SCHULTZ, CARTER, and WOLLE, JJ.

REYNOLDSON, Chief Justice.

We retained this appeal to determine whether alimony provided by a dissolution decree, once "terminated" by an order of modification, can ever be reinstated in a subsequent modification proceeding. We hold such a modification may be made in the unusual circumstances of this case, and affirm the trial court on this and other issues.

After a twenty-year marriage that produced six children, five still living, petition-

er Richard Carlson brought an action to dissolve his marriage to respondent Jacqueline Carlson. The dissolution decree was filed February 26, 1975. The findings of fact included the statement that:

Respondent has not been employed outside the home since the first child was born and has taken care of the household duties and has been a good wife and mother through the years. She has no skills and what she will be able to earn in the future is uncertain. . . .

The decree required Richard to pay Jacqueline $45 per week as alimony, and $25 per week for support for each of the four youngest children. The decree further provided:

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that as each of the four (4) youngest children, named above, reaches the age of majority, child support payments ordered shall cease for such child, reaching his majority, but the alimony payments awarded to Respondent above, shall be increased in an equal amount to each decrease in said child support, so that the total to be paid by Petitioner to Respondent, as child support and alimony, shall not decrease until further order of this court.

Respondent was awarded the home, which was mortgaged, and the furniture and fixtures. She continued to live in the home and care for the parties' four younger children.

The record discloses that from the first Richard resisted paying alimony and was slow and delinquent in paying child support, despite a job that then paid him almost $21,000 per year. Jacqueline could not maintain the house mortgage payments. By February 1977 the home was scheduled for sheriff's sale. At that time Richard was behind about $4800 in his support payments. Jacqueline required $1500 to pay the mortgage holders and terminate the foreclosure.

The district court file discloses an "Order Modifying Decree," dated February 22, 1977, upon the "joint oral application of the petitioner and respondent." This order recites "that the petitioner is in arrears on . . . support and alimony payments; that the respondent is immediately in need of at least $1500; that the petitioner and the respondent have stipulated and agreed subject to the approval of the court, to a settlement of such arrearages and a change in future payments. . . ." The decretal portion of this ruling provides in material part:

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Court that the petitioner pay and the respondent accept the sum of $1500.00 in full settlement of all arrears due the respondent by virtue of the herein decree.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that effective February 21, 1977, the petitioner's alimony obligation to the respondent is terminated; and that further effective said February 21, 1977, the petitioner shall pay unto the respondent through the office of the Friend of the Court as child support the sum of $100.00 per week beginning Saturday, February 26, 1977, and continuing until the minor child Stephen Carlson shall attain the age of majority; at which time child support shall be reduced to $75.00 a week until Mark Carlson shall have attained the age of majority; at which time child support shall be reduced to $50.00 a week until James Carlson shall have attained the age of majority; at which time child support shall cease and terminate.

This decree was signed "approved as to form" by both parties. The record reflects no hearing on the "oral application." The decree apparently was obtained by counsel different from those representing the parties in the dissolution proceeding. The testimony at this hearing leaves considerable doubt as to whether Jacqueline understood the legal implications of this ruling; it leaves no doubt of her inexperience and inadequacy in legal and business matters generally. She testified she compromised the delinquent payments because "it was survival for the children." At one point in his testimony Richard demonstrated an understanding of the arrangement incorpo-

rated in the decree; at another point he stated:

> I went through the kangaroo court and they turned around and picked it up out of the chamber. There was nothing talked about, alimony or anything. We talked about child support and here I came up with a decree.

After Jacqueline resolved the foreclosure emergency she continued to live in her home with three of the children. The furnace and the water heater broke down. She had no funds for repairs. Jacqueline sold this home in September of 1978 and paid off the mortgage, her utility bills and other indebtedness. She had enough left to put down $2000 on a different house and buy a car for $300.

In 1979 Jacqueline worked for a short time for Younkers before being laid off. Richard stopped the child support payments. Jacqueline ceased making payments on the home, moved out and commenced living with a son. Thereafter, she lived at times with various of her children and at the time of this hearing was living with a daughter. She was going to sell her furniture to pay living expenses, but found it had been stolen out of storage. At age forty-three, with a high school education but no specialized training, Jacqueline has been unable to find stable employment.

During most of the time following the dissolution Jacqueline had the physical care of the youngest son, James Joseph. Neither parent could control him. Following a court proceeding on January 29, 1982, James Joseph was sent to the Iowa Training School for Boys at Eldora, where he had made good progress. He was to have been released on July 31, 1982. Jacqueline testified she wanted alimony and support in order to obtain an apartment and make a home for him upon his release. In testifying, Richard resisted paying Jacqueline but said he would pay the child support to the Department of Social Services.

The evidence at this hearing disclosed that Richard remarried promptly after the dissolution. He still works for the railroad at an increased annual salary of about $26,000.

Trial court in this proceeding filed its findings of facts, conclusions and decree of modification May 12, 1982. With reference to Jacqueline the court found:

> She is not employed at the present time and it does not appear to this Court that she will obtain gainful employment within the foreseeable future. She is in desperate and destitute financial circumstances and from time to time resorts to living with her adult children.

The court concluded that once the matter of alimony had been considered and alimony awarded in the dissolution decree and "then by way of a modification of that decree such alimony was terminated, that it may again be considered by the court upon a proper and sufficient showing of material change of circumstances for reinstatement." Accordingly, the court decreed that alimony be reinstated in the sum of $50 per week from the date of the decree "until the respondent remarries or upon death of either of the parties or until further order of this court." Richard was further ordered to pay respondent, through the office of the friend of the court, $50 per week for the support of James Joseph until the child (then age 17) attained the age of eighteen years, became self-supporting, or married.

Appealing, Richard argues that alimony, once terminated, cannot be renewed, and that in any event no material change of circumstances has been shown. Further, he asserts he should not be required to pay child support to Jacqueline when their son is not in her custody.

## I. Restoration of Alimony.

Our analysis of the first issue must start from Iowa Code section 598.21 (1981):

> 3. Upon every judgment of annulment, dissolution or separate maintenance, the court may grant an order requiring support payments to either party for a limited or indefinite length of time after considering all of the following:
> [criteria (a) through (j) itemized]
> . . . .

8. The court may subsequently modify orders made under this section when there is a substantial change in circumstances.

■ Interpretations of similar predecessor statutes have evolved the familiar Iowa rule that "if the decree in a divorce action is silent upon the question of alimony . . ., or if the decree provides that no alimony is allowed . . ., the decree can not be thereafter modified so as to allow . . . alimony, although there may be a change in the circumstances of the parties . . . ." *Duvall v. Duvall,* 215 Iowa 24, 27, 244 N.W. 718, 719 (1932); *accord, e.g., Helvering v. Fitch,* 309 U.S. 149, 153, 60 S.Ct. 427, 429, 84 L.Ed. 665, 668 (1940); *Cappel v. Cappel,* 243 Iowa 1363, 1366, 55 N.W.2d 481, 483 (1952); *Pedersen v. Pedersen,* 235 Iowa 708, 712, 17 N.W.2d 520, 522 (1945); *Handsaker v. Handsaker,* 223 Iowa 462, 466, 272 N.W. 609, 611 (1937). This rule prevails among the various jurisdictions. *See* Annot., 43 A.L.R.2d 1387, 1391 (1955).

The rationale undergirding this rule in Iowa was first expressed in *Spain v. Spain,* 177 Iowa 249, 158 N.W. 529 (1916). There the divorce decree made no mention of alimony. The ex-wife applied for a modification to provide for alimony, alleging a change in her former husband's financial affairs. Rejecting this application, the *Spain* court wrote:

> She was not entitled to any alimony at the time her case was decided, and from the time of that decree he was under no obligation to support her, because she was no longer his wife. . . . The former wife relinquished her right to future support when she failed to have it awarded in the original decree, and no such obligation exists independent of some decree. As there was no such decree, there is nothing to modify. Had there been a provision for future maintenance, then either might have had a modification thereof upon a change in conditions and some equitable reason given for either enlarging or reducing it. The decree granted the wife relieved the husband from supporting her in the future, and

this decree is binding and not subject to revision. In this respect, the case differs from one where an allowance for future maintenance has been made, because in the latter case the duty has been cast on the former husband. This, we think, is the proper construction of the statute now under consideration as applied to the maintenance of the wife after divorce.

*Id.* at 260, 158 N.W. at 533.

■ In the case before us the dissolution decree did provide for alimony. This in turn triggered the statutory authority to make subsequent orders "enlarging or reducing it." In effect, Richard would persuade us the subsequent order that "eliminated" (or reduced to zero) the obligation to pay operated as a *nunc pro tunc* corrective amendment, eliminating *ab initio* all reference to the support obligation, and thereby stripping trial court of the power to reinstate payments. Under this record, we are not persuaded this result should follow.

Modification being only "an alteration in the terms of the adjudicated obligation," *Cartwright v. Atlas Chemical Industries, Inc.,* 623 P.2d 606, 610 (Okla.1981), "ordinarily is not used in the sense of completely setting aside the thing to be modified," *Van Deusen v. Ruth,* 343 Mo. 1096, 1101, 125 S.W.2d 1, 3 (1939). A modification operates prospectively, not retrospectively, and "does not authorize the court to divest the parties of rights accrued under the original decree," *Wren v. Wren,* 256 Iowa 484, 489, 127 N.W.2d 643, 646 (1964); *accord Pucci v. Pucci,* 259 Iowa 427, 431, 143 N.W.2d 353, 356 (1966).

An initial refusal to award alimony cannot be equated with an original award that is subsequently "terminated." In a case such as this, alimony is "an allowance to the ex-wife in lieu of the husband's legal obligation to support her." *In re Marriage of Hitchcock,* 309 N.W.2d 432, 437 (Iowa 1981). In refusing to make such an allowance in the dissolution decree the trial court, balancing the property provisions, the capabilities of the respective parties, and various other factors, determines the husband's obligation has ended with the marital relation.

The parties then leave their union with all matters settled between them. When the court awards alimony, however, it refuses to wipe clean the marital slate. The court determines, instead, the husband has a continuing support obligation and the lots of the parties are to this extent still bound together. The reach of that obligation may vary with the financial fates of the parties, but the obligation has been created and it survives the marriage.

The decisions relied on by Richard turn on the exhaustion or lack of jurisdiction in the trial court. *See Eckert v. Eckert,* 299 Minn. 120, 124, 216 N.W.2d 837, 839 (1974); *Garver v. Garver,* 102 Ohio St. 443, 133 N.E. 551 (1921). In Iowa, subject matter jurisdiction is the power to hear and determine cases of the general class to which the proceedings belong. *Powell v. Khodari-Intergreen Co.,* 303 N.W.2d 171, 173 (Iowa 1981); *Wederath v. Brant,* 287 N.W.2d 591, 594 (Iowa 1980). The Iowa district court has jurisdiction to hear and determine cases involving alimony and modification of alimony awards. Where, as here, the dissolution decree provides for alimony, Iowa Code section 598.21(8) invests the court with statutory power to make subsequent changes in alimony. In this state an order terminating, or ceasing, alimony payments neither divests the court of jurisdiction nor amends the statute that provides the power to make subsequent changes. There remains for us to consider only the effect of the prior modification decree.

Preliminarily, we observe that Iowa has established a precedent of rejecting the application of simplistic and arbitrary principles in this area. In *In re Marriage of Woodward,* 229 N.W.2d 274, 280 (Iowa 1975), we disavowed the rule that remarriage automatically terminated alimony, applying instead the rule that remarriage "make[s] out a prima facie case which requires the court to end it, in the absence of proof of some extraordinary circumstances justifying its continuance." We quoted with approval the following from *Wolter v.*

*Wolter,* 183 Neb. 160, 163, 158 N.W.2d 616, 619 (1968):

> Even cases which adopt the automatic termination approach tend to concede that there may be exceptional circumstances under which alimony might be considered as continuing, or that, at least, judicial determination of the question as to whether it continues might be advisable.

*Peters v. Peters,* 214 N.W.2d 151 (Iowa 1974), involved a dissolution decree that awarded alimony, but further provided "all alimony payments shall cease upon the . . . remarriage of Lela Peters." *Id.* at 153. The ex-wife remarried in Texas but the marriage was annulled about two months later. In *Peters* we examined the rule, prevailing in several jurisdictions, that a ceremonial marriage, later annulled, nonetheless invariably and automatically terminated the alimony obligation. We characterized that rule as inflexible, rigid, and in derogation of ordinary principles of equity. *Id.* at 156. Rejecting the rigid rule as "amount[ing] to judicial prejudgment of a situation which may be entirely different than that presupposed by it," *id.* at 157, we examined the intent of the court entering the dissolution decree, in light of extrinsic evidence received under the doctrine of *Hamilton v. Wosepka,* 261 Iowa 299, 154 N.W.2d 164 (1967). We then reinstated the alimony payments.

Applying the *Peters* approach in the case before us, we are not persuaded the trial court that executed the 1977 modification order intended to extinguish all right to future alimony payments, or to eliminate Jacqueline's right to make a subsequent application for support, based on a showing of substantial change in circumstances.

Bypassing any consideration of the validity of the prior modification where there were no supporting pleadings, we note the modification decree purports to be based on a "joint oral application" as to a *"change* in future payments" (emphasis added). The court's reference to the parties' stipulation does not suggest the concept of an unqualified and permanent extinction of the *right*

to future payments. The reference to the oral stipulation must be viewed in light of the testimony of the parties in this proceeding indicating there was no prior understanding that the right to make future alimony changes would be cut off.

It seems highly improbable that any judge would intend to order a permanent cessation of alimony after finding that the recipient thereof was "immediately in need of at least $1500.00." Nor would such an interpretation be in accord with the policy that our courts should be "slow to approve a stipulation that impoverishes one spouse," *Kjar v. Kjar,* 261 Iowa 334, 339, 154 N.W.2d 123, 127 (1967). In this instance the trial court, assuming it evaluated the concessions Jacqueline was willing to make in order to keep the home for her children, would likely have concluded "[s]he was willing to vary, but not to make void, the obligation which the [original] court had put upon her husband," *Capell v. Capell,* 164 Va. 45, 49, 178 S.E. 894, 895 (1935). In short, we hold that the trial court's use of the word "termination" in this instance does not evidence an intent to prohibit a later resort to the section 598.21(8) right to modify.

We believe it is clear that former spouses may waive the right to secure a modification reinstating alimony pursuant to section 598.21(8) and secure an implementing order if the court approves, or may lose that right by decree following a contested hearing. In other circumstances, even the language used in the 1977 modification order before us might suffice to show the court's intent to follow such an agreement or reach such independent determination. Upon this record, however, we cannot reach that conclusion.

Finally, we are convinced that the application of a simplistic and rigid rule to reach the trial court's intent in this instance would violate those principles of equity that initially launched, and still justify, the existence of equity courts.

Having arrived at the conclusion Jacqueline is not foreclosed from making this application for modification, we turn to the question whether she has demonstrated a change of circumstances from the time of the prior decree.

## II. *Change in Circumstances.*

Richard argues that Jacqueline's "circumstances have not materially worsened" since the 1977 modification, and thus trial court erred in reinstituting alimony payments in the 1982 decree. The applicable statutory provision is Iowa Code section 598.21(8), quoted in division I. The case law interpreting this provision has uniformly stated the familiar standard that to justify modification of alimony, *"circumstances which have changed must be those which were not within the contemplation of the trial court when the original decree was entered or at time of a subsequent intervening proceeding which considered modification of the alimony provisions of the original decree."* In re Marriage of Full, 255 N.W.2d 153, 159 (Iowa 1977) (emphasis added); *accord, e.g., In re Marriage of Jensen,* 251 N.W.2d 252, 253–54 (Iowa 1978). Further, such changes must be more or less permanent or continuous, not temporary. *E.g., Spaulding v. Spaulding,* 204 N.W.2d 634, 635 (Iowa 1973).

█ Without extending this opinion with detail, we hold circumstances materially changed between the time of the 1977 modification and the 1982 decree. Jacqueline lost her home. Her furniture was stolen. She has been unable to secure stable employment. She has been reduced to living with her children and is an obvious candidate for public charity. These conditions demonstrably are not temporary. Within the same period Richard's financial condition has improved, and he is paid more salary.

We hold trial court was right in holding there had been a substantial change of circumstances, justifying the alimony modification.

## III. *Child Support.*

█ Trial court ordered Richard to pay Jacqueline $50 per week, through the office of the Polk County friend of court, as child support for the minor child, James Joseph.

This decree was entered May 11, 1982. The evidence before the court was that James Joseph was making good progress at the Eldora institution, and would be released July 31, 1982. Obviously, if Jacqueline was to obtain and prepare living quarters to be available for herself and James Joseph upon his release, she required child support for this purpose.

We conclude in this instance we should apply the rationale of those cases in which we have held child support payments should continue for the benefit of the custodial parent even though the other parent has the child for visitations lasting several weeks. *In re Marriage of Schlenker,* 300 N.W.2d 164, 167 (Iowa 1981); *In re Marriage of Fleener,* 247 N.W.2d 219, 221 (Iowa 1976); *In re Marriage of Glass,* 213 N.W.2d 668, 671 (Iowa 1973). In those cases, of course, the obligation to pay was enforced to aid the custodial parent in maintaining the home during the child's temporary absence. Here the custodial parent has a short lead time both to obtain and to equip a home in which to receive the child. We hold trial court was right in making the child support available to Jacqueline for this purpose.

We affirm the district court decree.

AFFIRMED.